UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARIO MARTINEZ-GONZALEZ, <br> Plaintiff, <br> v. <br> ELKHORN PACKING CO., LLC, et al., <br> Defendants. | Case No. 18-cv-05226-EMC <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br> Docket No. 24 |

## I. INTRODUCTION

Plaintiff Dario Martinez Gonzalez worked for Defendants Elkhorn Packing Co. LLC and D'Arrigo Bros. Co. during the 2016 and 2017 lettuce seasons. He worked for Defendants as an agricultural laborer, and, in this lawsuit, he alleges that the companies failed to pay him appropriately, failed to provide adequate meal or rest breaks, and breached the duty of care they owed to Plaintiff by providing food that was unsafe to eat. In December 2018, Defendants moved to compel arbitration. *See* Docket No. 24. In arguing that the parties' Arbitration Agreement should not be enforced, Plaintiff raised the defenses of economic duress and undue influence. *See* Docket No. 28. On October 15 and 16, 2019, a bench trial was held to determine the enforceability of the Arbitration Agreement.

## II. FINDINGS OF FACT

A. <u>The Parties</u>

**1.** Plaintiff Dario Martinez Gonzalez is a Spanish-speaking Mexican national who—in 2016 and 2017—worked as an H-2A agricultural laborer for Elkhorn Packing Co. LLC ("Elkhorn") in California. He brings this suit alleging that Elkhorn failed to pay Plaintiff required minimum wages and overtime pay, failed to provide meal and rest periods, breached a duty of care

owed to Plaintiff, and breached their employment contract. *See* First Amended Complaint, Docket No. 13.

**2.** Defendants are Elkhorn Packing Co., LLC, and D'Arrigo Bros. Co. ("D'Arrigo"), of California. Elkhorn is a farm labor contractor located in Salinas, CA. D'Arrigo is a California agricultural grower that utilizes Elkhorn as a labor contractor. *Id.* at 2–3.

**3.** Several individuals testified at the trial:

    a. **Dario Martinez Gonzalez** – see ¶ 1. He was called as one of Plaintiff's witnesses.

    b. **Jose Juan Plascencia Macias** – is a Spanish-speaking Mexican national who worked for Elkhorn in 2016. He is acquainted with Mr. Martinez Gonzalez because they were on the same work crew for Elkhorn in 2016. He worked for Elkhorn in both 2016 and 2017. He was called as one of Plaintiff's witnesses.

    c. **Selina Arreola** – is employed by Elkhorn. Her current job title is manager, and she has been with the company for eleven years. She does not attend new-hire orientations, but she works with several of the Elkhorn employees who facilitate such events. She was called as one of Defendants' witnesses.

    d. **Octavio Vidales** – is currently employed by Elkhorn and has worked for the company for approximately eleven years. He was a foreman and later a supervisor, and for the last several years he has trained workers on company policies and regulations and conducted new-hire orientations. He speaks Spanish. He was called as one of Defendants' witnesses.

    e. **Carlos Garcia Gutierrez** – worked at Elkhorn from 2007 to 2017. During that time, he was a foreman who occasionally attended and assisted with new-hire orientations. He estimated that he had attended more than 100 orientations for new employees, but only two orientations specifically for H-2A workers. He speaks Spanish. He was called as one of Defendants' witnesses.

    f. **Crispin Bermudez** – currently works at Elkhorn and has been with the company for twenty years. He has had the role of harvest manager for fifteen years. He helps to recruit workers in Mexico and to oversee crews in the United States. He

speaks Spanish. He was called as one of Defendants' witnesses.

B. Stipulated Facts

**4.** The parties stipulated to the following facts:

    a. Plaintiff worked for defendant Elkhorn Packing Co. in 2016 and 2017.

    b. Plaintiff was authorized to work in the United States.

    c. Plaintiff was an H-2A employee during both times he worked for Elkhorn.

    d. Plaintiff was presented with an Arbitration Agreement in 2016 and 2017.

    e. The Arbitration Agreement was presented in Spanish.

    f. Plaintiff signed the Arbitration Agreements in 2016 and 2017.

    g. Plaintiff was not provided with a copy of the Arbitration Agreement to keep.

    h. No employee refused to sign the Arbitration Agreement or otherwise opted out of it in 2016 or 2017.

    i. Plaintiff was not expressly told that he could not work for Elkhorn if did he not sign the Arbitration Agreement.

C. Credibility Findings

**5.** The Court considered the demeanor and credibility of the witnesses throughout the trial, comparing their testimony to the available evidence, the testimony of other witnesses, and the arguments and briefing provided by counsel. Where the Court has resolved conflicts in testimony, it has place weight on its assessment of the witnesses' demeanor as well as the quality of their testimony and the existence of corroborating or contradictory evidence. Although more specific observations are made below, the Court notes that on certain key matters in dispute described herein, the testimony of Plaintiff's witnesses was more credible than the testimony of Defendants' witnesses. Defendants' witnesses were inconsistent with each other and with the record, and in several instances offered answers that strained credulity.

D. Recruitment and Hiring of Elkhorn Employees in Mexico

**6.** Plaintiff worked for Defendant Elkhorn in 2016 and 2017.

**7.** In 2016 and 2017, when Plaintiff was not in the United States, he lived in Mexicali, Mexico.

While in Mexico, Plaintiff worked agricultural jobs, earning significantly less money than was possible for him to earn in the United States. Testimony from Plaintiff's witnesses indicated that it was possible to earn five times as much in the United States as in Mexico. Plaintiff's testimony revealed that he had worked agricultural jobs in Mexico since age six; there was no evidence that he had ever had a different vocation. He attended school through the secondary school level, which was explained as the equivalent of elementary school plus three additional years. He did not learn English, but he can read and write in Spanish.

**8.** In 2016 and 2017, Plaintiff was responsible for financially supporting his wife, his mother, his step-father (who is now deceased) and his mother-in-law, who suffers from diabetes. His family's expenses included rent, bills (for water and electricity), taxes on their land, and medical expenses for various members of his family.

**9.** Plaintiff first learned about Elkhorn in 2015 and heard that they were hiring people to work in the United States legally. The process of applying to work for Elkhorn involved getting on an applicant list, completing an application, having one's application accepted, and then applying for a visa to enter the United States.

**10.** Elkhorn first accepted Plaintiff's application in Mexico in 2016. After accepting his application, Elkhorn assisted Mr. Martinez Gonzalez in obtaining a visa to enter the United States. However, the only paperwork that Plaintiff completed with or for Elkhorn while he was in Mexico (in either year) was paperwork associated with obtaining the appropriate visa and entering the United States. Mr. Martinez Gonzalez was not presented with any other employment options while applying for his visa. Arbitration was not mentioned as a term of employment with Elkhorn during this time.

**11.** Plaintiff was not presented with the 2016 Arbitration Agreement while he was in Mexico in 2016.

**12.** Plaintiff held an H-2A visa and was authorized to work in the United States in all times relevant to this case.

**13.** H-2A workers at Elkhorn were under the impression that their visas did not permit them to work for any employer aside from Elkhorn while in the United States under the H-2A

4

visa.

**14.** Plaintiff was hired again in 2017 by Elkhorn and obtained an H-2A visa to work in the United States. As in 2016, he was not provided with the 2017 Arbitration Agreement prior to returning to the United States in 2017.

E.  Orientation in United States

**15.** In both 2016 and 2017, the work that Plaintiff did for Elkhorn was in Monterey County.

**16.** To get workers to Monterey County, Defendants provided buses that transported them from Mexico. In 2016, Plaintiff boarded a bus in Mexico, and 12 hours later the bus arrived in Salinas, CA. In 2017, Plaintiff boarded a similar bus in Mexico, and approximately 12 hours later, that bus arrived in California. In 2017, Plaintiff was housed in King City, CA as opposed to Salinas.

**17.** In 2016, the bus that transported Plaintiff from Mexico arrived in Salinas around 1 or 2am. The workers on the bus were assigned to hotel rooms and the next day they boarded buses to go to work. While the workers were on that bus, Crispin Bermudez got on the bus and urged workers to put effort into their work for Elkhorn. He emphasized that they were privileged to be there, that it was a good opportunity, and he cautioned that those who did not want to work hard could go back to Mexico. Other supervisors who oversaw Plaintiff's work would often repeat this refrain, urging employees to work hard and to follow all company rules.

**18.** During the times that Plaintiff worked for Elkhorn, Elkhorn provided his housing and at least some of his meals. Upon arrival in the United States, Elkhorn employees moved into staff housing immediately. Elkhorn also provided transportation to and from the fields from the hotels; on occasion, the company buses would stop in town so that employees could buy things, send money home, and attend to other needs.

**19.** In the first few days of an employee's work with Elkhorn, the company would address a range of topics with new employees, including: company policies and regulations, housing rules, emergency plans, protecting oneself against pesticides, sexual harassment, food safety, and heat stroke.

**20.** During the trial, there was wide-ranging and inconsistent testimony about the way in which new-hire information was transmitted to employees. Some witnesses said that the company provides a single, unified orientation, while other witnesses stated that various meetings took place on buses, in the fields, and in hotel parking lots. However, all witnesses stated that at least one meeting each year—the one at which employees were directed to sign new-hire documents—was held in the parking lot of the hotel where workers were living. (This parking-lot meeting will hereinafter be referred to as an "orientation.") That meeting was run by Elkhorn supervisors, and all new-hire crews would attend. It appears that Mr. Vidales is typically the Elkhorn supervisor who conducts these parking lot meetings (sometimes with the assistance of Crispin Bermudez). He estimated that he has led 200-300 such meetings over the course of his time with Elkhorn. Mr. Bermudez estimated that he had participated in 400 or more orientations. Additional Elkhorn employees were often present to facilitate the part of the orientation during which new employees signed the various documents that had been presented to them. In both 2016 and 2017, the orientations attended by Plaintiff took place within the first few days of his arrival in the United States, after he and others had started working in the fields.

**21.** At new-hire orientations, Elkhorn witnesses testified attendance could range from forty people to over one hundred. At the 2016 and 2017 meetings attended by Mr. Martinez Gonzalez, approximately 150 H-2A employees attended the orientation in the hotel parking lot. Mr. Vidales testified that, even when there were more than one hundred employees present, he did not have a microphone or other means of amplifying his voice.

**22.** Mr. Martinez Gonzalez and Mr. Plascencia Macias credibly testified that there was no real explanation of the documents they were being asked to sign. Employees were directed to form lines to sign new-hire documents. While waiting to sign the new-hire forms, employees would stand on their feet. There were no chairs available for employees to sit while waiting to sign the documents (although the supervisors who were collecting signatures had chairs). Mr. Martinez Gonzalez said he stood in line for about 40 minutes before he reached the signing table. There were employees in front of and behind him. The orientation occurred after employees had been working in the fields. Mr. Martinez Gonzalez was tired and hungry when Elkhorn

supervisors told him to line up to sign the documents.

**23.** The Court notes that Defendants' witnesses variously and inconsistently said the orientation before the signing took either 45 minutes or several hours. Elkhorn witnesses also testified that it then took two or more hours to fill out forms and have each employee sign. Elkhorn testimony was inconsistent and not credible (*e.g.*, Mr. Vidales would orient over a hundred new employees for hours in a parking lot with no amplification while everyone stood on their feet, followed by two or more hours on their feet waiting to sign papers). As noted below, Elkhorn wage records are not consistent with these witnesses' accounts.

**24.** Plaintiff's witnesses credibly testified that no or only minimal explanation of the new-hire forms was presented, and that new employees were merely directed to line up in order to sign the forms. When employees got to the front of the line, the supervisors would flip through the pages of the new-hire packet and tell the employees where to sign. They were not given the documents to review prior to signing. The only explanation Plaintiff's witnesses obtained was that these forms related to Social Security. No mention was made or explanation given about the Arbitration Agreement. This account is more consistent with the time-records indicated on the employees' pay stubs, which reflect fifteen to thirty minutes of compensated time for "safety meetings" on the days when Plaintiff signed his new-hire forms (the dates Elkhorn witnesses agreed the orientations were given). Furthermore, the records show that on each of the orientation days, Plaintiff worked a full day in the fields, over 9 hours. There is no record of an hours-long orientation meeting (in addition to Plaintiff's work in the field) on either of those dates. As noted, the Court finds the testimony of Plaintiffs' witnesses to be more credible, and therefore concludes that the orientation meetings provided no real opportunity to review the new-hire documents.

**25.** As part of his role conducting new-hire orientations, Mr. Vidales was supposed to provide information to workers about the Arbitration Agreement. He had been trained to provide that information using a script provided to him by Selina Arreola. At the trial, Ms. Arreola was asked several questions about the Arbitration Agreement, and she struggled to answer some of them. For example, she was unable to explain the term "final and binding"; she had difficulty explaining the class action implications of signing the Arbitration Agreement, and she did not

7

believe that Mr. Vidales had ever received a copy of the American Arbitration Rules. She evidenced only a cursory understanding of the Arbitration Agreement. Furthermore, when Plaintiff's attorneys read out Crispin Bermudez's deposition testimony regarding the Arbitration Agreement, Ms. Arreola said that what Mr. Bermudez described deviated from the explanation she had given him. In addition, she stated that she had never attended an orientation and, therefore, had never actually heard Mr. Vidales or Mr. Bermudez explain the Arbitration Agreement to workers. Mr. Vidales also testified that the script for explaining the Arbitration Agreement does not mention anything about giving up the right to class actions.

**26.** The script that Elkhorn supervisors are supposed to utilize in explaining the Arbitration Agreement outlines four points:

   a. Arbitration is a means of having disputes resolved without going to a court trial, which can be time-consuming and expensive.
   b. In arbitration, the employee and Company agree on an arbitrator to resolve their dispute.
   c. The Company pays the cost of the arbitrator and all other costs of arbitration. However, each party pays for his/her own representative or attorney.
   d. When we sign this Agreement, we are agreeing to have all disputes resolved by arbitration. Should you change your mind, you have seven days[1] to notify us in writing of your decision.

**27.** Although Elkhorn witnesses testified that an explanation about the arbitration agreement to new hires was included in the orientation and that 10-15 minutes was devoted to explaining the Arbitration Agreement, the Court finds that testimony not credible. The Court credits the testimony of Plaintiff and Mr. Plascencia Macias that no explanation about the Arbitration Agreement was given.

---

[1] However, the Arbitration Agreement itself says that employees have ten days (as opposed to seven days) to inform Elkhorn that they wish to revoke their acceptance of the Arbitration Agreement.

F. Signing of the New Hire Documents

**28.** In 2016, Plaintiff was presented with the new-hire documents at an orientation session held by Elkhorn on or around April 11, 2016. In 2017, Plaintiff was presented with the new-hire documents at an orientation session held by Elkhorn on or around March 28, 2017.

**29.** As noted above, on the days Plaintiff was presented with the new-hire documents in 2016 and 2017, he had already worked a full day in the fields. His paystub from the orientation day in 2016 reflects a "Safety Meeting" that lasted approximately one half of an hour. His paystub from the orientation day in 2017 reflects a "Safety Meeting" that lasted approximately 15 minutes. Testimony from Plaintiff's witnesses indicated that a typical workday for Elkhorn employees would begin at 6:30 or 7am and conclude around 4pm. Employees worked Monday through Saturday.

**30.** During the orientation sessions attended by Plaintiff in 2016 and 2017, Elkhorn employees instructed Mr. Martinez Gonzalez to sign a number of new-hire documents. In 2016, that new-hire packet included a W-4 IRS form, a food safety form, a workers compensation agreement, a pay rate notice, an indemnification form, and the Arbitration Agreement. In 2017, the new-hire packet included a W-4 IRS form, an I-9 IRS form, a food safety form, a workers compensation agreement, a housing policies and employee manual acknowledgement form, and the Arbitration Agreement.

**31.** In 2016, Plaintiff signed the Arbitration Agreement on or around April 11, 2016. In 2017, he signed the Arbitration Agreement on or around March 28, 2017.

**32.** The Arbitration Agreements were written in Spanish, but Plaintiff was not provided with a copy of the Arbitration Agreement to review in advance or given an opportunity to read it at the time of signing. Nor was he told he could keep a copy of the document in either year.

**33.** The 2016 and 2017 Arbitration Agreements did not include language indicating that the Agreements were optional, nor did any Elkhorn employee ever explicitly inform Plaintiff that the Agreements were optional. Similarly, Plaintiff was never explicitly informed that he could seek the advice of an attorney before signing the documents or hold onto the documents to read or otherwise review them before signing them. In fact, the testimony of Plaintiff's witnesses

suggests that employees never even had physical custody of the documents; instead, Elkhorn supervisors held the papers and simply pointed employees to the signature page to sign.

**34.** Although several Elkhorn supervisors testified that they believed that the Arbitration Agreement was not mandatory and that no employee would be terminated for refusing to sign the Arbitration Agreement, the Court does not credit that testimony. Mr. Vidales could not explain how he was so informed; Ms. Arreola did not use the word "voluntary" in training Mr. Vidales. There is no document that states that signing the Arbitration Agreement was voluntary and not required. Nor does the script so state. In fact, Mr. Garcia Gutierrez said employees were required to sign the entire packet of documents, which included the Arbitration Agreement. Various comments made by Elkhorn supervisors during the trial suggest that it was implied to workers that signing the Arbitration Agreement was mandatory. For example, Mr. Vidales said he would say, "[t]his is another document you are going to sign. It's called the Arbitration Agreement," when presenting the Arbitration Agreement to workers. Mr. Garcia Gutierrez also testified that the Arbitration Agreements were not voluntary. As noted above, he stated that he believed the documents were required for the employees to begin working, and he stated that he would look for any worker if he or she did not sign all the documents. In any event, no employee was told signing the Arbitration Agreement was optional.

**35.** Elkhorn supervisors testified that of the thousands of employees hired, no employee has ever refused to sign the Arbitration Agreement. Nor did anyone opt out of it in 2016 or 2017. There is no evidence that any employee ever opted out. Mr. Vidales specifically testified he was not aware of any employee ever refusing to sign the paperwork presented at orientations.

**36.** Mr. Plascencia Macias indicated that he asked a few questions about the documents that he was signing; Elkhorn employees told him that the documents he was signing were for "seguro," meaning "insurance" or "social security." The Elkhorn supervisors stated that that employees were invited to ask questions about the documents, but at least Mr. Garcia Gutierrez testified that no employee had ever asked him any questions. (He also testified that he would not have been able to explain the rights that employees were waiving by signing the Arbitration

10

Agreement.)

**37.** The supervisors who were present and assisting in the collection of signatures in both 2016 and 2017 urged employees to hurry so that the people behind them in line could also sign the documents. In neither 2016 nor 2017 were employees provided with the documents in advance in order to have an opportunity to review them prior to signing them. (One Elkhorn witness testified that copies of documents were distributed to new hires and that Mr. Vidales went over them during orientation; that testimony was squarely contradicted by another Elkhorn witness who testified the documents were *not* distributed to new hires prior to signing.)

**38.** Although Elkhorn did not state that refusal to sign the Arbitration Agreement would result in loss of employment, nor did it physically threaten new hires into signing the Arbitration Agreement, Plaintiff still had numerous reasons to believe that signing the documents presented to him was mandatory. For example: (1) employees were told to hurry, (2) the employees were lined up in lengthy queues to sign the packet of documents, (3) the employees were tired and hungry after having worked in the field all day, and (4) Elkhorn supervisors had emphasized the importance of following the rules, while raising the specter of being sent back to Mexico if employees did not work hard, and (5) employees were in the United States on an H-2A visas procured through Elkhorn. As a result, Plaintiff credibly testified that he believed that he had no option but to sign the papers (including the Arbitration Agreement) to continue working for Elkhorn in both 2016 and 2017. He believed that if he refused to sign any of the documents, he would not be given work and would be sent back to Mexico. He did not believe it was possible—on an H-2A visa—to leave his current employer and seek work with another employer in the United States.

**39.** As noted above, employees were not provided with copies of any of the new-hire documents to keep; all documents were collected by supervisors once they had been signed, and they were returned to Elkhorn's offices in Salinas, CA, where they were stored. Specifically, Mr. Vidales collected all the signed documents and transmitted them to Elkhorn headquarters. Failure to obtain all signatures on the documents might have delayed that transmittal.

**40.** At no point did Plaintiff revoke his signing of either Arbitration Agreement.

11

However, Plaintiff lacked sufficient knowledge of the contents of the Arbitration Agreement to either (1) understand that he had signed such an Agreement, or (2) become informed of the window within which (and the method by which) he would have be able to withdraw, had he so desired. Mr. Vidales was not aware of any worker that has ever used the 10-day window to withdraw his or her consent to the Arbitration Agreement. Moreover, it appears that Plaintiff did not have access to a computer and a printer if he wanted to revoke in writing (as required by the Agreement).

**41.** Plaintiff did not understand that—by signing the Arbitration Agreements in 2016 and 2017—he had forfeited certain legal rights, including the right to a trial in a court of law and the right to participate in a class action. It was not until he spoke with the lawyers representing him in this case that he understood the contents of the Arbitration Agreements that he had signed.

**42.** In sum, in both 2016 and 2017: (1) Plaintiff was not informed about the Arbitration Agreement either in Mexico when he applied for the job or at the orientation in the United States; (2) in neither instance was he offered a reasonable opportunity to read the Arbitration Agreement; (3) the Arbitration Agreement was signed with a stack of papers after Plaintiff arrived in the United States within days after a 12- or so hour bus ride from Mexico and after a full day's work in the fields; (4) he had no familiarity with arbitration or what rights he was giving up when he signed both agreements; (5) he was financially dependent on Elkhorn employment as he made only a fraction of the pay doing agricultural work in Mexico; (6) his family depended on his income; (7) he reasonably believed he could not work for any other United States employer on his H-2A visa and that if he was refused employment with Elkhorn he would have to return to Mexico without a job; (8) he reasonably believed that he had to sign the Arbitration Agreement along with the other papers as directed, at risk of losing his job; (9) he was never told signing the Arbitration Agreement was optional or voluntary.

### III. CONCLUSIONS OF LAW

A. Presumption of a Valid Contract

**43.** Under California law, "[a] party to a contract may rescind the contract . . . [i]f the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake,

12

or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party." Cal. Civ. Code § 1689(b)(1).

**44.** Where a contract is prima facie valid, "under California law the burden of proving a claim of 'undue influence' is on the claimant." *Olam v. Cong. Mortg. Co.*, 68 F. Supp. 2d 1110, 1139 (N.D. Cal. 1999). Similarly, the burden of proving a claim of "economic duress" is on the claimant. *See, e.g.*, *Ferdinando v. Intrexon Corp.*, No. 16-CV-01826-BTM-JMA, 2016 WL 6947060, at *6 (S.D. Cal. Nov. 28, 2016).

**45.** The Court finds that Defendants have made a prima facie showing that Mr. Martinez Gonzalez entered into a valid, enforceable arbitration agreement with Elkhorn. Before the Court are two typed documents entitled "Acuerdo de Arbitraje" or "Arbitration Agreement," one from 2016 and one from 2017. Plaintiff signed those documents, as did Elkhorn, through its representatives. Plaintiff does not dispute the fact that he signed the documents.

**46.** As a result, since Mr. Martinez Gonzalez seeks to escape the obligations of these Arbitration Agreements, he will "bear the burden of persuasion" in convincing the Court that either or both of the defenses of economic duress and undue influence apply. *See Olam*, 68 F. Supp. 2d at 1140.

B.  Economic Duress

**47.** Under California law, the doctrine of economic duress "may come into play upon the doing of a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure." *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 3d 1154, 1158 (Ct. App. 1984).

**48.** The "wrongful act need not be in the nature of a tort or crime," however "merely being put to a voluntary choice of perfectly legitimate alternatives" does not amount to duress. *Johnson v. Int'l Bus. Machines Corp.*, 891 F. Supp. 522, 529 (N.D. Cal. 1995) (quoting *Rich & Whillock*, 157 Cal. App. 3d at 1158).

**49.** "Whether the party asserting economic duress had a reasonable alternative is determined by examining whether a reasonably prudent person would follow the alternative

course, or whether a reasonably prudent person might submit." *CrossTalk Prods., Inc. v. Jacobson*, 65 Cal. App. 4th 631, 644 (1998).

**50.** In addition, some courts have held that a claimant must also show that the defendant knew of the plaintiff's economic vulnerability and that there was actual inducement to contract. *See, e.g.*, *Tanner v. Kaiser Found. Health Plan, Inc.*, No. C 15-02763-SBA, 2016 WL 4076116, at *4 (N.D. Cal. Aug. 1, 2016).

**51.** As Plaintiff contends, "Elkhorn's decision to present the Arbitration Agreement for signature after agricultural workers arrived in California and were living in employer-controlled housing was a coercive wrongful act." Plaintiff's Trial Brief at 3, Docket No. 49.

**52.** Although Elkhorn provided Mr. Martinez Gonzalez with information about the work that he would be doing for them while Mr. Martinez Gonzalez was still in Mexico, the company did not provide him with any information about the Arbitration Agreements prior to his arrival in the United States in 2016 or prior to his return to the United States in 2017.

**53.** The Arbitration Agreements were only to provided to Plaintiff once he had arrived in the United States. Moreover, the Agreements were only provided to him once (1) he was in possession of an H-2A visa that he reasonably believed permitted him to work only for Elkhorn, (2) was living in housing provided by Elkhorn, and (3) had already begun harvesting lettuce for Elkhorn and D'Arrigo.

**54.** In addition, Plaintiff had already been admonished by Elkhorn supervisors to follow Elkhorn's rules and do as the supervisors instructed him to do or risk being sent back to Mexico.

**55.** Under these circumstances, having already been transported to the United States under the auspices of an H-2A visa obtained through Elkhorn's job offer, Plaintiff had no "reasonable alternative" but to sign documents he was told to sign. He reasonably believed he could not seek work with another employer, did not have another place to live should his employment with Elkhorn end, and did not even have his own means of transportation by which to return to Mexico.

**56.** Courts have found that no reasonable alternative exists "when the only other

14

alternative is . . . financial ruin. . . . Courts employ an objective test to determine if 'reasonable alternatives' exist." *Brandt v. Verizon Commc'ns, Inc.*, No. 18-CV-07575-VKD, 2019 WL 4082562, at *5 (N.D. Cal. Aug. 29, 2019).

57. As Plaintiff explained in his testimony at trial, he was the breadwinner for his family in Mexico, where multiple family members were relying on his income to cover basic expenses like rent, water and electricity bills, taxes, and medical expenses. When not working in the United States (where he could earn five times as much as he was earning in Mexico), Plaintiff worked as an agricultural worker in Mexicali.

58. Even the testimony from Defendants' witnesses acknowledged this reality. As Mr. Bermudez stated: "We understand that behind every employee, there are three, five, even up to eight people from their families who depend on that worker." Additionally, according to the testimony of Plaintiff's witnesses, the Elkhorn supervisors repeatedly emphasized how lucky the employees were to have the opportunity to work for Elkhorn and how they should work hard not to lose it. Clearly, Elkhorn was aware of the economic vulnerabilities of their agricultural workers, as they spoke openly about those vulnerabilities both in Salinas and before this Court.

59. Thus, the evidence presented by both sides indicates that Plaintiff was in a very challenging financial situation with very few financial resources available to him in Mexico. With significant financial obligations animating his thinking, no reasonable worker in Mr. Martinez Gonzalez's shoes—without alternative employment prospects, an alternative place to live should he lose his job, and no practical way to return to Mexico—could have refused to sign the Arbitration Agreements that were presented to him without any representation by Elkhorn that signing the Arbitration Agreement was optional.

60. With respect to the requirement of inducement, courts "require[e] a nexus between contractual assent and coercion." *Johnson*, 891 F. Supp. at 530. Here, Elkhorn's decision to present the Arbitration Agreement for signature only after Mr. Martinez Gonzalez was in California and living in Elkhorn-provided housing, and only after the work of picking lettuce had already begun, after admonishing him and other workers to follow the rules or risk being sent back to Mexico, and with awareness of the extremely difficult financial circumstances in which Mr.

15

Martinez Gonzalez lived, placed Plaintiff in a situation in which it would have, as a practical matter, been impossible for him to refuse to sign the Arbitration Agreement. The fact that out of thousands of workers, no other Elkhorn worker had ever refused to sign the Arbitration Agreement corroborates this point.

**61.** As the Supreme Court has held, arbitration is a "is a matter of consent, not coercion." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). Where economic duress is what compels a party to sign a contract, there is no true consent, and coercion is the true driving force. Such a contract is not valid or enforceable, and—under the theory of economic duress—the Arbitration Agreement executed between Plaintiff and Defendants is such a contract.

**62.** Accordingly, all the elements of economic duress have been met: (1) a sufficiently coercive wrongful act on the part of the defendant (¶¶ 50-52); (2) no reasonable alternative on the part of the plaintiff (¶¶ 52-57); (3) knowledge of the plaintiff's economic vulnerability (¶¶ 57-58); and (4) actual inducement to contract (¶ 59 ).

C. <u>Undue Influence</u>

**63.** Under California Civil Code § 1575 "Undue influence consists: (1) In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him; (2) In taking an unfair advantage of another's weakness of mind; or, (3) In taking a grossly oppressive and unfair advantage of another's necessities or distress." Cal. Civ. Code § 1575.

**64.** California courts recognize a number of factors that are suggestive of undue influence: "(1) discussion of the transaction at an unusual or inappropriate time, (2) consummation of the transaction in an unusual place, (3) insistent demand that the business be finished at once, (4) extreme emphasis on untoward consequences of delay, (5) the use of multiple persuaders by the dominant side against a single servient party, (6) absence of third-party advisers to the servient party, (7) statements that there is no time to consult financial advisers or attorneys." *Odorizzi v. Bloomfield Sch. Dist.*, 246 Cal. App. 2d 123, 133 (Ct. App. 1966).

**65.** However, not all of the *Odorizzi* factors need to be present in order for undue

influence to occur. *See Kelly v. Provident Life & Acc. Ins.*, 245 F. App'x 637, 639 (9th Cir. 2007).

**66.** Here, many of the *Odorizzi* factors are present. First, the testimony made clear that the presentation of new-hire documents came at an unusual or inappropriate time. The parking-lot orientation took place at the end of the day, when Plaintiff and other employees had already worked a full day in the fields. Many if not all of those present were tired, hungry, eager to get cleaned up before going to sleep. In addition, they were made to stand on their feet (potentially for hours) while the paperwork was processed, and there was nowhere for them to sit even when they were signing the documents. More importantly, the Arbitration Agreement (or even an explanation of the Arbitration Agreement), was not provided to Plaintiff or other workers in Mexico before they committed to the job, made the long journey in employer-provided transportation to the United States, and were placed in a position—once in the United States—from which they had no practical way out, if they refused Elkhorn's direction to sign the Arbitration Agreement.

**67.** It also appears that the consummation of the contract occurred in an unusual place: a hotel parking lot. While this may have been a convenient place to gather groups of dozens or even hundreds of employees, it is an unusual place to execute legally binding documents. As noted above, the fact that employees had no place to sit down, no desks upon which they could review the documents prior to signing them, and no opportunity or privacy that would permit them to speak with an attorney or family member outside of the presence of their employer or coworkers are all suggestive of an unusual setting.

**68.** Significant evidence was also presented that suggests that Elkhorn made insistent demands that the signing of the contracts be completed rapidly. The supervisors who were present and assisting in the collection of signatures in both 2016 and 2017 urged employees to hurry so that the people behind them in line could also sign the documents, and employees were aware that many people were waiting to complete the new-hire paperwork. Furthermore, employees were not provided with the documents in advance in order to have an opportunity to review them prior to signing them. Nor were they told they could take the documents with them to review and then sign at a later date. Hence, even in 2017, Mr. Martinez Gonzalez had no knowledge or

17

understanding of the Arbitration Agreement when he applied for work with Elkhorn.

**69.** Elkhorn supervisors also repeatedly and seriously emphasized the negative consequences of failing to comply with Elkhorn rules. Mr. Martinez Gonzales reasonably believed that he had no choice but to sign the documents presented to him. If he did not, he believed that he would be fired and either sent back to Mexico by Elkhorn and/or he would no longer be eligible to work in the United States.

**70.** There were also no third-party advisers present to assist the employees in determining whether they would sign the documents. Not only were no lawyers present to advise the employees, but the employees did not believe they were given time to seek out and consult with an attorney. More fundamentally, they did not believe that they were signing any documents that would have benefitted from the advice of an attorney.

**71.** The fact that no Elkhorn supervisors expressly and affirmatively told the workers: (1) that they could not ask for time to review the Arbitration Agreement; (2) that they could not ask to consult with an attorney; or (3) that they had to sign the Arbitration Agreement at risk of losing their jobs, did not negate the coercive environment created by the circumstances and the reasonably perceived risks facing Plaintiff and his co-workers.

**72.** Taken together, the presence of so many of the *Odorizzi* factors establishes the existence of undue influence on the part of the Defendants. The Court concludes that, taken together, these factors evince "grossly oppressive" conduct on the part of Elkhorn and finds that Plaintiff has met his burden to demonstrate that undue influence was present.

///
///
///
///
///
///
///
///

18

## IV. CONCLUSION

**73.** The Court concludes that the Arbitration Agreement executed between Dario Martinez Gonzalez and Elkhorn Packing was the product of both economic duress and undue influence. As a result, the Agreement is neither valid nor enforceable, and the Court **DENIES** Defendants' Motion to Compel Arbitration.

This disposes of Docket No. 24.

**IT IS SO ORDERED**.

Dated: October 29, 2019

EDWARD M. CHEN
United States District Judge