Pages 1 - 41

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

DARIO MARTINEZ-GONZALEZ,           )
                                   )
            Plaintiff,             )
  VS.                              ) NO. C 18-05226 EMC
                                   )
ELKHORN PACKING COMPANY, LLC,      )
et al.,                            )
                                   )  San Francisco, California
            Defendants.            )
_____)

                         Thursday, February 6, 2020

                  **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
                    3 Williams Road
                    Salinas, California  93905
              **BY:  ANA VICENTE DE CASTRO, ESQ.**

                    PUBLIC JUSTICE, P.C.
                    1620 L Street, N.W.
                    Suite 630
                    Washington, D.C.  20036
              **BY:  KARLA A. GILBRIDE, ESQ.**

For Defendant Elkhorn Packing Company, LLC:
                    TYSON & MENDES
                    5661 La Jolla Boulevard
                    La Jolla, California  92037
              **BY:  REGINA SILVA, ESQ.**


Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court


(Appearances continued, next page)

**APPEARANCES, CONTINUED**:


For Defendant D'Arrigo Brothers Company of California:
                         LAW OFFICES OF GEOFFREY F. GEGA
                         1851 East First Street
                         Suite 900
                         Santa Ana, California  92705-4066
                BY:  **GEOFFREY F. GEGA, ESQ.**

<u>**Thursday - February 6, 2020**</u>                                      <u>**2:10 p.m.**</u>

<u>P R O C E E D I N G S</u>

**THE CLERK:**  Calling Civil Matter 18-5226,

Martinez-Gonzalez versus Elkhorn Packing Company LLC, et al.

Counsel, please approach the podium and state your

appearances for the record.

**MS. DE CASTRO:**  Good afternoon, Your Honor.  Ana

Vicente De Castro on behalf of plaintiffs.

**THE COURT:**  All right.  Thank you, Ms. De Castro.

**MS. GILBRIDE:**  And Karla Gilbride, also on behalf of

plaintiff.

**THE COURT:**  All right, thank you, Ms. Gilbride.

**MS. SILVA:**  Good afternoon, Your Honor.  Regina Silva

representing Elkhorn Packing.

**THE COURT:**  Thank you, Ms. Silva.

**MR. GEGA:**  Good afternoon, Your Honor.  Geoffrey Gega

representing D'Arrigo Brothers.

**THE COURT:**  Good afternoon, Mr. Gega.

The current law -- although there may be some division in

the circuits, the current law in the Ninth Circuit appears to

be that whether to stay a case pending appeal of a denial of a

motion to compel arbitration is something that is -- still lies

within the exercise of discretion of the trial court.  There is

no mandatory rule in this Circuit.  At least, *Britton versus*

*Co-op Banking* so held.

1      And a number -- nearly all the district courts that have

2  looked at this issue still believe that under *Britton* that a

3  stay is not mandatory; that is a matter of discretion and

4  evaluation by the District Court.

5      Do you have any other case law to suggest to the contrary?

6  Ms. Silva?

7          **MS. SILVA:**  Your Honor, in our papers we cited cases

8  which indicated that in arbitration proceedings, the normal --

9  the normal action that is taken is to stay the action.

10         **THE COURT:**  The normal action.  But in terms of the

11  ultimate question, there are -- there are some circuits which

12  say it's mandatory.

13         **MS. SILVA:**  Correct.

14         **THE COURT:**  And indeed, the circuits are split 5-3

15  right now, but the Ninth Circuit is -- has not taken the view

16  that has been taken by some of the other circuits.

17         **MS. SILVA:**  Right.

18         **THE COURT:**  At least at this point.

19         **MS. SILVA:**  Yes.  I think that is correct, that is

20  not mandatory.  However, the general reception by the district

21  courts has been when it's on a -- concerns an arbitration issue

22  is to stay.  And obviously, that makes logical and reasonable

23  sense, because the case ends up in arbitration, if it gets

24  reversed and ends up in arbitration, then anything we did

25  before you, Your Honor, would be a complete waste of time,

1    waste of money, and resources of this Court.

2          THE COURT:  Right.  As I understand it, the briefs

3    are due in April in the Ninth Circuit in this case?

4          MS. SILVA:  No, it's the end of March.

5          THE COURT:  March.

6          MS. SILVA:  Yes.  It was just moved, by the way.

7    Before -- just so you know, the date was earlier.  And it was

8    just moved because the court -- the Ninth Circuit set a

9    mediation meeting.

10          THE COURT:  Okay.

11          MS. SILVA:  So it moved out briefly the time period

12    for the filing of the briefing.

13          THE COURT:  Okay.  And do you know if this is going

14    to be heard by a motions panel?  Or by a regular merits panel?

15          MS. SILVA:  I do not know that.

16          THE COURT:  Do you know?

17          MS. GILBRIDE:  I don't see any reason why it would

18    not be heard by a merits panel.  It's not a motion.  It's an

19    interlocutory appeal.  So in the normal course, it would be

20    heard by a merits panel.

21          THE COURT:  All right.  And you don't have a date for

22    argument yet, I assume.

23          MS. GILBRIDE:  That's correct.  There's no date for

24    argument.

25          THE COURT:  Do either of you have any estimates,

```
 1   looking at the Ninth Circuit time to disposition these days,

 2   for a non-motions panel, for a regular merits panel, what it's

 3   taking, once briefs are submitted?

 4         MS. SILVA:  I don't think it takes that long because

 5   I had another case that also went before the Ninth Circuit,

 6   Your Honor.  And it wasn't that long between the briefing

 7   period and when we actually appeared.  We did -- before --

 8         THE COURT:  Less than 12 months?

 9         MS. SILVA:  Yes.

10         THE COURT:  Do you have any other information?

11         MS. GILBRIDE:  In the cases that I've had at the

12   Ninth Circuit, it has ranged.  So a case that was submitted in

13   March of 2019, we held oral argument in December of 2019, nine

14   months later.

15       In another case where we just filed -- the reply brief was

16   filed in December of 2019, we received oral argument calendar

17   dates in, you know, July, August, and October.  So if it gets

18   set for one of those, it would also be within nine to ten

19   months for the case to be argued.  Not for a decision,

20   obviously.

21         THE COURT:  Well, let me ask.  Normally, what the

22   Court looks to with respect to granting a stay pending appeal

23   are the four usual factors:  Likelihood of success, whether

24   there's irreparable injury if the stay is denied, what the

25   injury will be if the stay is issued, and the public interest.
```

1          On the question of success on the merits, whether there
2     are, for instance, serious questions going to the merits of
3     this case, much of the -- the defendants' argument, appears to
4     me, sort of conflates or confuses unconscionability with the
5     question of economic duress or undue influence.  Those are two
6     very distinct doctrines.
7          And my -- my ruling was based on the economic duress --
8     you know, the contract defense of economic duress and undue
9     influence, not unconscionability.  There are obviously some
10    overlapping factors, and something else, can be sort of
11    parallel.  But I -- so in arguing what some of the serious
12    legal questions are, you know, it seems to me that those aren't
13    really on point.
14         This seems to me, what we did was take very
15    well-established traditional law of economic duress, and
16    applied it to the facts of this case.  That's how I saw that,
17    the evidentiary hearing or trial that we had.  I didn't see any
18    novel doctrinal issues.
19         Maybe I missed something, but I -- I don't see what the
20    sort of difficult legal questions are.  You can argue it's a
21    close call on the facts, maybe, and maybe you can disagree with
22    what I did and what I found on the facts.
23         But I'm not sure I see sort of the close difficult legal
24    questions like in employment classification cases or some of
25    these other cases where there are tough, leading, cutting-edge

1   legal questions.  Am I missing something here?

2           **MS. SILVA:**  Well, Your Honor, I think that one of the

3   prefatory issues here, if you want to talk about your ruling

4   with respect to these -- economic duress, undue influence, is

5   that -- I mean, our position is that unconscionability is an

6   issue, and that is part of this arbitration finding.  It's not

7   just -- it's not just a matter of:  Okay, I found these

8   defenses to be -- to have some merit, these contract defenses

9   have some merit, so therefore I can knock out the arbitration

10  agreement on those grounds.

11          It seems that there is some question here as to whether or

12  not that is proper, to make a finding only on those grounds.

13  It's not addressed on unconscionability issues, since the

14  courts have -- in every case, they address the

15  unconscionability.

16          And there's a sliding scale that is considered when you're

17  looking at procedurals and substantive --

18          **THE COURT:**  Well, that's one defense.  That's the

19  typical one that's raised, because there's usually not much of

20  a duress defense.  I mean, when somebody decides to work for a

21  particular company, you know, a driver drives for Lyft or Uber,

22  it's -- it's not -- typically a question that arises is

23  unconscionability, not duress.  And so this case is different.

24  That's what I'm saying.  This is not -- it's a different kind

25  of a case here, seems to me.

1      **MS. SILVA:**  Which begs then the question for the

2   Ninth Circuit, which is:  Is it appropriate to use these

3   economic -- these basically defenses that are being asserted

4   here to support the finding, which is this -- the economic

5   duress, undue influence.

6      If that's going to be applied in our -- with respect to

7   the enforceability of arbitration agreements, that you can

8   knock out an arbitration agreement based on just these contract

9   defenses, alone, never mind --

10      **THE COURT:**  So you think there's a legal question

11   whether or not the defense of economic duress can be used to

12   invalidate an arbitration agreement?

13      **MS. SILVA:**  Well, in and of itself, without anything

14   else, I think there is an issue there with respect to the

15   application of just, like I said, it's economic duress, if

16   you're just going to look at that solely with respect to the

17   enforceability of arbitration agreements.  Because it ignores

18   this sort of premise that has been established by the Ninth

19   Circuit as well as the State of California when you're looking

20   at whether or not an arbitration agreement is enforceable.

21      I mean, long precedent talks about how you have to look at

22   unconscionability, both procedural and substantive, to --

23      **THE COURT:**  Well, that's why you continued to

24   conflate unconscionability with economic duress.  I devoted a

25   whole several pages to the doctrine of economic duress, which

1    is very distinct from unconscionability.  And that is an issue

2    of general contract law.  It is not peculiar, nothing about it

3    is aimed at arbitration, per se.  It could be about any kind --

4    and that's why it is not an easy standard to me.

5        I mean, not everybody can just walk up and say:  I've got

6    economic duress, and I want to undo my contract to buy this --

7    you know -- car or whatever it is.

8            MS. SILVA:  Yes, Your Honor.  But if you're just

9    going to use it in the arbitration setting to knock out an

10   arbitration agreement, that I think warrants -- that's a legal

11   issue that warrants this -- that warrants this as far as a

12   legal issue for review by the Ninth Circuit.  Because --

13           THE COURT:  And the legal issue as you are framing it

14   is whether or not the defense of economic duress can apply to

15   invalidate an arbitration agreement?

16           MS. SILVA:  Well, in and of itself, without review of

17   the conscionability factors, yes.  I think that is a legal --

18           THE COURT:  So without a review of conscionability,

19   even if all the factors of economic duress are satisfied,

20   without an analysis -- a concurrent analysis of

21   conscionability, the Court does not have the power to

22   invalidate an arbitration agreement?

23           MS. SILVA:  Well, I think if you're asking me what

24   the legal issue is, okay.  And I'm saying that yes, that is a

25   legal issue of --

1      **THE COURT:**  What case -- I don't remember -- to tell

2   you the truth, I don't remember you making that argument.  I

3   don't remember this.

4      We went through on a motion to dismiss early on, and went

5   through the trial.  I don't remember an argument that says the

6   Court cannot consider duress, economic duress, outside the

7   confounds or not concomitant to an unconscionability analysis.

8   I don't remember that.

9      **MS. SILVA:**  Well, I think we went as far as -- I

10  mean, I think with respect to our motion to stay, I think we

11  put in there that this is part one of a legal issue.  We raise

12  the fact that these contract defenses is basically what is

13  being relied upon in order to knock out the arbitration

14  agreement.

15     **THE COURT:**  All right, let me hear from the

16  plaintiffs, what your view, then, is.

17     **MS. GILBRIDE:**  The doctrine of economic duress and

18  the doctrine that duress invalidates consent necessary to form

19  a contract is codified under California law, California Civil

20  Code Section 1567, along with mistake, menace, fraud, and undue

21  influence.  The doctrine of unconscionability is codified,

22  California Civil Code Section 1670.5.  It's a completely

23  separate doctrine.

24     The only cases that defendants have cited -- and they

25  cited them in their reply brief, where the two were conflated,

 1   was where they were conflated -- or not conflated, perhaps --

 2   but where both an unconscionability challenge and a duress

 3   challenge were made by the plaintiffs.

 4        And the courts considered them together, finding some

 5   overlap in the factors, in both the *Itkoff* case and the *Clark*

 6   case, two District Court opinions.

 7        There's no opinion cited in any of their briefs that

 8   outlines the argument that they're making to this Court today,

 9   which is that regardless of whether unconscionability is pled

10   as a defense, it is somehow necessary for the Court to consider

11   it as part of an argument.

12        Particularly, it seems the argument they are making is

13   only when an arbitration clause is at issue.  They're not

14   making that argument with respect to any other type of contract

15   that is challenged on economic duress grounds.  And that would

16   seem to violate the equal-treatment principle, that arbitration

17   agreements be treated like other sorts of contracts.

18        So it doesn't -- to the extent I understand the argument

19   that they're making, it does not support it, either by federal

20   case law or by California case law.

21        **MS. SILVA:**  I mean, if you are going to use these

22   contract principles with respect to this -- as far as

23   conscionability standard, and combine them, I mean, at a

24   minimum you have to -- like I said, if they're using these

25   contract defenses of undue influence and the -- the two -- you

1  know, the two defenses for the contract formation, if that's

2  looked upon, if anything, it's under the procedural

3  unconscionability, you still have to weigh the substantive

4  unconscionability prong.  Because it's a sliding scale.

5      And so that's been our --

6      **THE COURT:**  A sliding scale within the confines of

7  the unconscionability doctrine.  But contract formation, for

8  instance, is wholly separate.  The normal -- the question of

9  contract formation are wholly separate in many ways than

10  unconscionability.  Unconscionability assumes there is a

11  contract but there's something wrong with the contract that

12  makes it unenforceable.

13      Formation questions, on the other hand, are predicate to

14  that.  They're completely independent.  You can find no

15  contract was formed, without any inquiry into conscionability.

16      Now, you may argue that:  Well, but the contract formation

17  issue here is one of duress.  And it sounds a lot like

18  conscionability.

19      Well, it may, and that's why there's a doctrine, there's a

20  statute that governs it.  And maybe some of the facts might

21  inform, you know, both kinds of doctrines here.

22      But I don't see any case that says you've got to consider

23  one and apply one to the other; you can't have, for instance,

24  economic duress without unconscionability, or vice-versa.

25  Those are two independent doctrines.

1          And I understand there's some overlap.  And it may be that

2     a lot of the facts that might lend one, you know, to argue

3     procedural or substantive unconscionability are similar, but

4     not necessarily identical to those that might lend themselves

5     to an economic duress argument.  But you know, I think you have

6     to take each one as its own.  So I'm not sure I see a serious

7     legal question there.

8          Let me ask you about -- let me ask you -- I want to move

9     on.  I want to ask about the irrepairable harm question.  So

10    one irrepairable harm obviously is being denied the benefits of

11    an arbitration clause.  And that is something that has the

12    force of the Federal Arbitration Act behind it, and the

13    policies behind it.

14         On the other hand, as I have done in other cases, I have

15    allowed things to proceed if we don't actually get to the

16    adjudication of the case.  That assumes you've tried the case,

17    you've gone through, and you've essentially, you know,

18    eliminated arbitration.

19         On the other hand, as the plaintiffs point out, there's

20    going to have to be some discovery, one way or the other, in

21    this case, whether it proceeds by arbitration, whether it

22    proceeds by way of court cases.

23         Why not allow -- and I guess one question I have for the

24    plaintiff, let's say we assume this is going to take, I don't

25    know, six to eight months for the Appellate Court to act on the

1    appeal.  Hopefully not much longer than that, but it could.

2    What kind of discovery would you propose during this interim

3    period?

4            MS. GILBRIDE:  Well, first and foremost, we would

5    need to know who is covered both by the PAGA claim in the case,

6    and the claim under the federal -- the Fair Labor Standards

7    Act.  And we would like the contact information for those

8    people, as well as relevant time and pay records.

9        Time is of the essence for that information, in particular

10   because we're dealing here with a population that is very

11   transient, migrant farmworkers who are often working short-term

12   jobs in different locations, moving around when they're living,

13   you know, in Mexico, moving around both within the country and,

14   then coming to the United States to work.

15       They may be difficult to locate.  Information that the

16   defendant has in its possession for former addresses may no

17   longer be current.  And therefore, to get timely notice to

18   those individuals who have claims whose statutes of limitations

19   are continuing to run, the sooner that we can get that

20   information so we can begin to try to locate them and inform

21   them of their potential rights in this case, the sooner we'll

22   have an opportunity to get notice to them in a manner that --

23           THE COURT:  And the statute of limitations on a FLSA

24   claim is running, correct?

25           MS. SILVA:  Yes.

1          **THE COURT:**  Unlike a Rule 23 class where there could

2     be a freezing of the statute of limitations.

3          **MS. GILBRIDE:**  That's correct.  I mean, we did ask in

4     a footnote in our brief that if the Court is inclined to grant

5     the stay, in whole or in part, that we would seek equitable

6     tolling, so that at least the statute does not run any further.

7          **THE COURT:**  All right.  So part of your interest is

8     in preserving evidence because of the fluid and ephemeral

9     nature of the members of the class and those who would benefit

10    under PAGA.

11         **MS. GILBRIDE:**  That's correct.

12         **THE COURT:**  That you need the contact information

13    now, and even awaiting six months, nine months, 12 months would

14    be injurious.

15         **MS. GILBRIDE:**  That's correct.  The quality of that

16    information is going to continue to degrade with time.  In

17    addition, information relevant to the practices, the labor and

18    pay practices that we would be contending make the members of

19    the putative class similarly situated to Mr. Martinez-Gonzalez,

20    you know, those would be things about what were the travel

21    procedures during the seasons that he was working there.  What

22    were the types of work the people were required to do in the

23    fields when they arrived.  That information may be in the

24    possession of former supervisors who no longer work for either

25    of the defendants.

```
 1          And so preserving access to those witnesses is also

 2   something that is time-sensitive, and that we would be harmed

 3   by further delay.

 4          THE COURT:  So you think there's an ephemeral nature

 5   of former supervisors who may have evidence.

 6          MS. GILBRIDE:  With the continued passage of time,

 7   yes.  You know, one of the people who is relevant to the

 8   contract-formation trial that we held several months ago had

 9   already moved on, and was no longer working for defendant.  And

10   we would submit that other people who worked during that time

11   period may also have moved on.

12          THE COURT:  So what would you -- besides written

13   discovery and contact information, let's say in the next six

14   months, what else -- are you proposing that you be able to take

15   depositions as well?

16          MS. GILBRIDE:  Yes.

17          THE COURT:  Of whom?

18          MS. GILBRIDE:  Of the supervisory employees; of

19   people who are responsible custodians of pay records who would

20   have -- you know, if we get documents but we're not sure how to

21   interpret them, we would need to have access to the --

22          THE COURT:  Now, the pay records is something that

23   there would be less urgency, right?  If there is a preservation

24   order.

25          MS. GILBRIDE:  But if we have lost the -- you know,
```

1   if the person who is most knowledgeable at interpreting the pay

2   records or explaining the pay records is no longer employed by

3   defendants, then having access to the records if we no longer

4   have the people most knowledgeable about them, and particularly

5   going back in time, you know, we're talking about going back to

6   2016, for perhaps, you know, five years ago by the time this --

7   the proceedings at the Ninth Circuit are resolved, we could be

8   going well into 2021.  You know, that that information is going

9   to be about five years old.

10      And we want to have access and take the deposition of

11  people who are knowledgeable about those records at the time

12  that they were created.

13          THE COURT:  All right let me ask defendant.  There's

14  -- at least under the current law, a PAGA claim cannot be

15  waived in an arbitration agreement.  The arbitration agreement,

16  as I understand it, does have a class waiver and a

17  representative waiver, but that's ineffective under the *Scanion*

18  (Phonetic) case, and under Ninth Circuit law.  And so there's

19  going to be a PAGA claim still standing.  Unclear whether that

20  would go to arbitration, or whether that would be heard in

21  court.

22      But, the point is there's going to be at least one

23  representative claim in here.  And so there's going to be

24  discovery, whether it's arbitration or court.

25      Why not, during this interim period, allow discovery to

1  proceed?  Perhaps it can be circumscribed and scoped.  But,

2  keeping in mind that this -- the people affected tend -- are

3  migrant workers, it's going to be harder to get this

4  information as time goes on.  It's more fluid, more ephemeral.

5       Why not allow -- even if we don't go to trial, even if we

6  don't have dispositive motions, why not allow essentially

7  preservative-type discovery while the appeal is pending?

8            **MS. SILVA:**  Well, Your Honor, I'm not understanding

9  why we are assuming it wouldn't be preserved.

10           **THE COURT:**  Because, because people move.  I mean --

11           **MS. SILVA:**  Well, just so you know, they already are

12  moving.  People in Mexico, it's a -- this type of employees,

13  they -- there's always issues concerning where they're at,

14  locating them.

15      And it doesn't matter whether it's now or whether in six

16  or eight months, you still face the same issues.

17           **THE COURT:**  Well, doesn't it get worse over time?

18  You wouldn't argue ten years from now, you're in the same

19  position as you are today.

20           **MS. SILVA:**  I've worked in this business probably

21  longer than all counsel here -- well, except for him

22  (Indicating).  And I can tell you right now that you can't find

23  somebody in one month or two -- it doesn't make a difference

24  how much time is going by, whether or not you're able to locate

25  them.

1     **THE COURT:**  No, but more and more people -- maybe for

2   any individual, that's true.  I'm not sure if that is true.  It

3   seems to me if your trail is ten years old as opposed to ten

4   months old, there's a difference there.  But let's put that

5   aside for a moment.

6     **MS. SILVA:**  Okay.

7     **THE COURT:**  You might lose ten people, instead of

8   five people.  As time goes on, you tend to lose more and more.

9   We have this problem with jurors.  We have such a non-response

10  rate, you would be shocked.  And notwithstanding, you know,

11  trailers and all sort of stuff that we use, people move.  Here

12  in the Bay area.  And it's hard to find people, even though

13  they are legally obligated to respond.

14    **MS. SILVA:**  Uh-huh.

15    **THE COURT:**  So, time is not a friend.  You're not

16  going to argue that.  Time is not a friend if you're trying to

17  find people.  As time goes by, stuff happens.

18    **MS. SILVA:**  Right.  But what I'm saying is that due

19  to the migrant nature of these employees, it -- again, if

20  you -- if you can't locate somebody in, like, a month versus

21  six months, doesn't make a difference here, okay.  Because

22  people change numbers, they're moving in and out, whoever

23  they're staying with.

24    We have the same issue on the employer side.  That's what

25  I'm saying.  I've been practicing for a very long time, dealing

1    with the agricultural industry.  And it doesn't make a

2    difference in how much time has gone by, as far as being able

3    to locate them, for one.

4              THE COURT:  So once they're lost, they're pretty much

5    forever lost.

6              MS. SILVA:  Not lost, no.  I mean, there's just more

7    work that's usually involved.  But I'm going to have to do that

8    more work, regardless of whether I'm looking at trying to

9    locate somebody now versus in six or seven months.  It's the

10   same process I'm going to run into.

11        I mean, she's talking again about filing -- about pursuing

12   claims since 2016.  We're going -- you know, we're going to

13   have that issue, regardless.  Because you're either going to

14   have people who stay with the company, who are there for years,

15   and who -- you have employees like that who come back, every

16   season, you see them every season they come back.  Okay, you

17   have that group.  They're always going to be there, so we're

18   going to be able to locate them.

19        And then you have the other people who are sort of in and

20   out, or who don't come back.  Or they're there for maybe one

21   season, and then they're out.  I mean, it's not going to make a

22   difference, is the point.  And that is, again, given this type

23   of worker.

24             THE COURT:  Let me ask you the flip side.

25        What is the -- if discovery were focused on, you know,

1  getting the contact list, and whatever the most current

2  information you have for those who might be within the group of

3  beneficiaries or on the PAGA claim or who might have FLSA

4  claims, providing records of their employment and their pay,

5  providing, you know, whatever writings there might be regarding

6  procedures, how many employees -- what's a rough number of

7  people you anticipate, were thinking maybe affected within the

8  limitations period here?

9       Do you have any idea?  Anybody have any idea?

10           **MS. SILVA:**  Yeah.  A few hundred.

11           **THE COURT:**  A few hundred.

12           **MS. SILVA:**  Uh-huh.

13           **THE COURT:**  All right.  So it seems to me that yeah,

14  there's some burden in producing records, having to give up and

15  maybe devoting some time.  And if there is a handful of

16  depositions of some supervisors or custodians of record, it

17  seems to me that -- balance that against the possible loss of

18  evidence as time goes on, is not a heavy burden.

19       And that can be done without necessarily depriving the

20  defendant of its right to arbitration in the end, because, you

21  know, hopefully we'll get a decision sooner rather than later,

22  so that that issue will be decided.  Whether it's going to

23  arbitration or going to court.  And your venue rights are,

24  therefore, protected.  At some point, if it goes too long,

25  we'll have to see.

1          But I mean, why not -- in other words, maybe call it a

2     partial stay.  Allow discovery to go forward, allow the

3     preservation -- the importance of preservation to be done at --

4     it seems to me a limited burden on the defendant.  Keeping the

5     door open to see what happens, how quickly the Ninth Circuit

6     moves.  But at least preserving the evidence, which I think is

7     the plaintiffs' main and most compelling argument here.

8          **MS. SILVA:**  Well, first of all, again, we don't have

9     an issue with preserving of evidence, because we already are

10    preserving the evidence.

11         So it's not like we're going around instructing our client

12    to destroy anything or to make sure --

13         **THE COURT:**  I meant preserving -- yeah, I didn't mean

14    preserving in the sense of a preservation order.  I meant

15    taking preservative steps as a litigant.  Sometimes it's taking

16    a deposition to get that testimony of somebody before they

17    leave.  Or talking to witnesses and, you know, making contact

18    before they sort of disappear.  That kind of thing.

19         **MS. SILVA:**  Well, if they're talking about taking --

20    first of all, the people they mention they want to depose are

21    supervisors, former supervisors, people who served in a

22    supervisory position.  And I don't have a problem with locating

23    that.

24         So I don't see what the issue here is with waiting, you

25    know, six months or whatever it is before the Ninth Circuit

1    reviews this, in order to try to take the deposition of someone

2    who either is currently working in a supervisory position for

3    our client or is no longer working in a supervisory position

4    for our client, because we could find those people.

5        As they point out, there was one person who already was no

6    longer working for our client, but guess what?  We found -- it

7    was very easy to find him.

8        So I don't have a problem in locating our own people who

9    are the people they said they want to depose.  We don't have an

10   issue there of locating them.  So I don't see how that's

11   prejudicial to them, since we can produce those individuals.

12           **THE COURT:**  What about the other things that I

13   mentioned?

14           **MS. SILVA:**  Well, with respect to your other issues

15   about whatever these -- the FLSA and PAGA claims, first, I want

16   to point out that there's been no ruling with respect to the

17   arbitration agreement that was signed by all of these people

18   who might be part of a representative class, since your ruling

19   and findings is only limited to the plaintiff,

20   Mr. Martinez-Gonzalez.  So we have this entire issue dealing

21   with these other employees who did sign an arbitration

22   agreement.

23       So if, at the end of the day, the Ninth Circuit decides

24   that your ruling is correct, and affirms your ruling, okay,

25   Mr. Martinez-Gonzalez is going to be an individual here, and on

 1    a different path than these other people.  So --

 2              THE COURT:  So he'll be a valid -- number one, he'll

 3    be a valid PAGA representative, so the PAGA claim would proceed

 4    in one venue or another.  We'll have to determine where that

 5    goes, should we come to that point.

 6         Two, if you're suggesting that it would have to be

 7    individual trials with respect to each of the potential people

 8    who want to opt in, we'll have to address that during the

 9    certification process, I guess.  But we'll have to see.

10         But the facts -- you know, unless the facts are

11    dramatically different, they're going to yield the same --

12    similar outcomes, seems to me.

13              MS. SILVA:  Well, they are going to be --

14              MR. GEGA:  Go ahead.

15              MS. SILVA:  They are going to be different for each

16    person who signed --

17              THE COURT:  Materially.

18              MS. SILVA:  I mean, there's been no testimony as

19    to -- as to all of these other agreements that were signed by

20    these other people.  So that's a whole other can of worms that

21    we need to deal with.

22         And if this Court is going to proceed in litigation with

23    respect to everybody, keep it all open while we're waiting for

24    Ninth Circuit, we're going to be filing litigation.  I'm not

25    going to wait for class certification.  I'm going to be moving

1   to decertify.

2       If you're going to decide there's a FLSA action --

3       **THE COURT:**  Well, that's your prerogative.  If you're

4   the one seeking the stay, and you want to then litigate, I

5   mean, that's up to you.

6       **MS. SILVA:**  I don't want to litigate.  I'm saying if

7   I'm forced to litigate.  Believe you me, I think it's going to

8   be a waste of the Court's resources.  I don't want to be

9   bringing unnecessary motions before this Court.

10      But if I'm forced to have to defend this case on behalf of

11  my client, I'm going to have to implement these other

12  procedures and bring motions before you which, in the end,

13  might be moot because --

14      **THE COURT:**  I didn't say I would schedule a hearing

15  on certification of FLSA.  I didn't say that.

16      **MS. SILVA:**  Okay.

17      **THE COURT:**  I could.  I didn't say that.  All I'm

18  asking right now is discovery.  Take one step at a time.

19  Discovery, while the appeal is pending.

20      I mean, frankly, I could also just say, you know, I don't

21  think there's any serious questions raised.  I mean, if you at

22  least raise a serious question, that opens the door for a stay.

23  And there's a good argument here there's not even a serious

24  question raised.  But I don't know if I need to go there.

25      It seems to me that the main goal right now is to allow

1    the plaintiff to conduct enough discovery in order for them to

2    not lose any evidence.  I mean, the same position as if this

3    case were to proceed even without arbitration, or with

4    arbitration.

5        I mean, either way, there's going to have to be some

6    evidence exchanged here.  And we'd take it one step at a time.

7        **MS. SILVA:**  But as to even getting discovery,

8    Your Honor, that's going to be at issue.  Okay?  Because we

9    disagree that they're entitled to get this discovery.  We

10   completely disagree.

11       So this is going to be back before you.  I don't know how

12   we're going to avoid not having motions that are going to have

13   to be set and heard by you in order to get anywhere, if they

14   are looking at trying to get --

15       **THE COURT:**  If we have to do that, we have to do

16   that.  But that's still preservative, and respectful of your

17   right to arbitration, because my -- my view is that there is

18   going to have to be discovery, anyway.  You cannot waive a PAGA

19   claim under current Ninth Circuit law and California Supreme

20   Court law.  So that claim is going to exist if -- you know,

21   sort of regardless, actually.  And so, so there's going to have

22   to be some discovery in that regard.

23       **MS. SILVA:**  But the case law also says that PAGA

24   claims can be in arbitration.  So, yes --

25       **THE COURT:**  Even if it's going to be in arbitration,

1   there's going to have to be discovery.  I don't see anything in

2   the arbitration agreement that says no discovery, is there?

3   Because I don't read Spanish, but I did have the Paragraph 3

4   translated for me, the class waiver.  I wanted to see what that

5   said.

6       But, is there something in here that says no discovery?

7       **MS. SILVA:**  Well, it doesn't say no discovery,

8   Your Honor.  But the point is if the case ends up in

9   arbitration, the PAGA claims are in arbitration.  We have --

10  the -- the person who's the arbitrator is going to be the

11  person making decisions as to these issues.  As to what is the

12  scope of discovery that's even allowed.

13      So this is not going to be a free-for-all where there's

14  going to be this discovery that they're going to get.  There's

15  going to be motion work that's going to have to be made in

16  connection with that.

17      And then the motion work has to be filed with you, and

18  then there's a change in where we go, the forum for that, then

19  it's basically going to make all these other -- any other

20  rulings by you, for example, make it moot.  Because then the

21  arbitrator's going to have -- we have the right to have the

22  arbitrator to hear those issues.

23      **THE COURT:**  Well, that's why I'm talking about a

24  partial stay.  A partial stay, yes.  That means that the

25  plaintiff may not get everything they want.  It means that you

can't get exactly the replica of what you want.   But it is a

fair way to balance the respective interests here, in light of

the four-factor test.

      **MR. GEGA:**  Except, Your Honor, with respect to

discovery, what plaintiff is actually seeking here is discovery

of the entire litigation, including all these people that would

be in a prospective class, when the -- the essence of the

problem with everybody except for Mr. Martinez at this point is

that we don't even know if their arbitration agreements will

ultimately be enforceable.

    And if they are, that what's being requested here is

essentially exhausting discovery of the entire case, even

before there's any issue debating --

      **THE COURT:**  Well, I'm going to ask you -- we're

making a lot of assumptions right here.   I'm going to direct

the parties to meet and confer, and talk about a discovery plan

for the next, let's say, six months, keeping in mind that I'm

not saying you're going to get full discovery as you would as

if in this case, you totally ignored the arbitration

possibility.

    But I'm also saying that I'm not going to necessarily

limit this strictly to exactly what the arbitration would

necessarily entail, because we don't know for sure exactly what

the arbitrator would order.   But we have some guess as to what

the arbitrator might do, especially in a PAGA case.

1   What I'm doing is trying to strike a reasonable balance so

2   that the burden on the defendant is a tolerable burden, a

3   reasonable one, reasonably preservative of its primary rights

4   under the arbitration clause, at least for now, while

5   protecting the core rights of the plaintiff to get the kind of

6   evidence they need to make sure that that doesn't disappear

7   because of a nine-month delay.  That's the critical thing.

8       **MS. GILBRIDE:**  If I could just speak to -- to make

9   sure that this meet-and-confer is as productive as it possibly

10  can be, I'm hearing a threshold dispute about whether we would

11  be entitled as part of that discovery to names and contact

12  information for other people who may be similarly situated, or

13  other aggrieved employees under PAGA, because the argument that

14  I'm hearing defendants make here is that because there is an

15  arbitration agreement in place, we don't even get to know those

16  people's names or their contact information.

17      And our position is diametrically opposed to that, in

18  order to figure out --

19      **THE COURT:**  I've made it clear, and I'll make it

20  clear again.  Yes.  Those names should be available because of

21  the interest of preserving -- given the ephemeral nature of

22  this group of people, this particular kind of class that we are

23  dealing with, it is important that that contact information be

24  provided.

25      And, and I've said it once, I'm going to say it one more

 1   time:  I'm not trying to replicate one proceeding or another.

 2   I'm not saying this is exactly what I think the arbitrator

 3   would do.  Or I'm also not saying you're entitled to everything

 4   you want as if this case didn't have an arbitration clause.

 5       My priority is to get information that has time value to

 6   it, that has a risk of fading, risk of being lost, to preserve

 7   what we can over the next several months while this case

 8   progresses.

 9       If this case does not progress in the Ninth Circuit in six

10   months, eight months, at that point I may have to make the hard

11   decision whether to continue the stay at that point, or end the

12   stay, and then let you take it up with the Ninth Circuit.

13       But right now, my interest is in balancing the -- what I

14   think is a tolerable burden on the part of the defendant to

15   comply with some discovery, with a focused discovery effort by

16   the plaintiff to seek evidence for which there is some risk of

17   loss over the next, let's say, six to nine months.

18       **MS. GILBRIDE:**  And with respect to the six to nine

19   months, the only other thing I would say to that is, you know,

20   the briefing on the appeal is not going to be completed for at

21   least three months.  Opening briefs are due in March, and then

22   optional reply brief in May.

23       So, you know, realistically, if we're looking at around

24   nine months from conclusion of briefing to an argument is held,

25   the argument won't even be held until early 2021.

1      So are we going to revisit this at --

2          **THE COURT:**  I'm going to have further -- that is what

3  I just said.  I said this is an interim measure.  If it looks

4  like we get to the point where we're going to have to take

5  further steps, and I have to decide whether to extend the stay

6  or widen the stay, I'll make that decision at that point.

7      This is intended to govern, you know, and ensure that

8  evidence is preserved that otherwise would be lost, let's say,

9  in the next nine months.

10         **MS. SILVA:**  Your Honor, just so we're clear here, as

11  well, you know, obviously I know you've said, well, there would

12  be this PAGA claim pending.  But there -- there's a difference

13  here between the PAGA statute of limitations and any purported

14  FLSA statute of limitations that would be in play.

15     And, they would not be entitled to anything under any FLSA

16  -- that would fall under the FLSA claims.  Because, again,

17  we've got all these other arbitration agreements that were

18  signed by these other individuals.

19     So, they're not -- like I said, I understand what you are

20  saying about the PAGA claim.  That's a different statute of

21  limitations than what we're dealing with in the FLSA.  And

22  defendants --

23         **THE COURT:**  All right.  Then, let me make myself

24  clear.

25     PAGA is one example as to why there should be discovery in

 1   the first place, that is likely to happen in any event.  You're

 2   saying:  Well, to the extent there is a longer limitations

 3   period for FLSA, particularly for willful violation?

 4          **MS. SILVA:**  Yes, it's -- it's a different statute.

 5          **THE COURT:**  I understand that.  But we don't know

 6   whether those claims are going to lie.  We don't even know if

 7   there's going to be certification; we don't know for sure.

 8       But because there is a possibility that that may well

 9   happen, and unless you can demonstrate to me an overwhelming

10   burden, that the equities suggest that that kind of evidence,

11   even within the FLSA limitations period, should be preserved.

12   And I mean preserved not just in the sense of a preservation

13   order, but in the sense of the plaintiff's ability to obtain

14   the evidence, to document that evidence, or do whatever they

15   need to do to secure that evidence.

16          **MS. SILVA:**  Well, there is prejudice to us,

17   Your Honor, because there's been no ruling as to the

18   enforceability of the arbitration agreement that was signed by

19   all of these people who will be part of this class.  So yes, it

20   is very manifestly unfair to the defendants when --

21          **THE COURT:**  What's the burden?

22          **MS. SILVA:**  Well, the burden is us having to disclose

23   and give over names and contact information of people who

24   haven't agreed to even be part of --

25          **THE COURT:**  Okay, that's a different issue.  That's a

1    different issue.  It's not --

2             **MS. SILVA:**  And --

3             **THE COURT:**  Hold on.  Hold on.  Hold on.

4             **MS. SILVA:**  Okay.

5             **THE COURT:**  That's a different issue.

6             **MS. SILVA:**  (Nods head)

7             **THE COURT:**  When I'm talking about your burden, I'm

8    talking about your administrative burden of getting documents

9    and producing them.  I don't think that's a big burden.  Your

10   burden is a privacy interest.  And that's a different question

11   and that's true in all class action cases.  And whether you

12   have to give some kind of a notice procedure, that's something

13   you all can work out.  You've done this many times before.

14       The question of disclosing potential class members to a

15   plaintiff class is something you do many times, and you've

16   worked out those procedures, I'm sure, in the past.

17            **MS. SILVA:**  Your Honor --

18            **THE COURT:**  So you can work it out.

19            **MS. SILVA:**  In this kind of case, no, that is not

20   correct, because they haven't -- there's been no ruling as to

21   the enforceability of the arbitration agreements that were

22   signed by these other people.

23            **THE COURT:**  All right.

24            **MS. SILVA:**  So you can't --

25            **THE COURT:**  Discovery is not going to wait for that

1  definitive determination.  Because I've already determined that

2  in the whole, given the pattern that I saw, given the evidence

3  that I saw, these are not enforceable arbitration agreements.

4      So we don't just start from scratch.  With -- with -- hold

5  on.

6          MS. SILVA:  (Nods head)

7          THE COURT:  With all the work that I've put into this

8  case and all the evidence I allowed you to put on, you're up

9  against a steep hill.  I'm telling you that right now.

10         MS. SILVA:  Okay.

11         THE COURT:  So I'm not going to say no discovery,

12  because I have not definitively decided that every arbitration

13  agreement is enforceable.  I've already seen one peek at what

14  it looks like.  Now, I'm not saying that they're all like that,

15  and we may have to make determinations.  And that may affect

16  all sorts of issues.

17     But I'm not going to stop discovery and foreclose

18  discovery when we have an ephemeral class with a potential loss

19  of evidence because there is an existing arbitration agreement

20  which already, at least in one test case, has been found by

21  this Court to be unenforceable.

22         MS. SILVA:  With all due respect --

23         THE COURT:  I'm not going to stop discovery.  And so

24  the limitation -- to cut it short, the limitations period is

25  going to run to whatever the earliest limitations period is,

1    whether it's PAGA, whether it's FLSA, whatever it is that's at

2    play in this case, for this limited discovery purposes.  I'm

3    not saying the whole door is opened.

4         **MS. SILVA:**  Well, I think that you are opening the

5    door if you're going to allow them to get all of this discovery

6    as to all these people, since we haven't had the opportunity to

7    adjudicate these core issues which impacts the rest of this

8    purported class.

9        I mean, I wasn't the one who set the guidelines here at

10   the beginning as far as the enforceability of the arbitration

11   agreement.  That was decided -- it was to this individual

12   defendant.  We defended our clients at this arbitration

13   hearing, based on the enforceability of the arbitration

14   agreement as to one defendant --

15        **THE COURT:**  Well, to the extent that this was a

16   bellwether case --

17        **MS. SILVA:**  -- as to one plaintiff.

18        **THE COURT:**  Yes, true.  But --

19        **MS. SILVA:**  It's unfair to our clients.

20        **THE COURT:**  It appears to me that it is somewhat a

21   bellwether case.  I mean, unless you can show me what is unique

22   about Mr. Martinez-Gonzalez's case and makes it so distinct and

23   different and differential, materially different from everybody

24   else, that his was his alone, I've got to give some weight to

25   it.

1    In any event, we are talking about a stay.  Even if we

2    didn't have an appeal, if we just went forward, I would allow

3    discovery.  It may be limited, it may be step by step, which is

4    what I'm trying do here.  But I would allow discovery.

5    And because of the appeal, because of the pendency of

6    appeal, I've looked at this carefully, and decided to take this

7    on an incremental basis.  You may not like the increment I'm

8    chopping off, but that's the increment that I'm ordering.

9    So I'm go to order you -- and I will get out an order

10   confirming what I'm holding today, what the direction's going

11   to be for you to meet and confer, keeping in mind the balancing

12   interests I'm trying to maintain here, and the priority on the

13   preservative function of discovery here.  Not just all

14   discovery I want to build my case or leverage settlement talks,

15   but to preserve the evidence.

16   So if you're looking at records that are going to exist

17   anyway, you know, that's not so strong as trying to get names

18   of witnesses and key people who may be moving and disappearing,

19   et cetera, et cetera.  And trying to preserve their testimony.

20   So that's what I would like you to meet and confer about.

21   That's what this order is going to do.  And I will set forth

22   and affirm my rationale for that.

23   **MS. SILVA:**  And if the defense -- if we're going to

24   move in this direction, will the defendants get an opportunity

25   then to submit a motion to decertify, then?

1          **THE COURT:**  If that's what you want to do.  I mean,

2    the stay was for your benefit.  But if you think you don't --

3    you want to try to terminate this in other ways, given what

4    I've done, I'm not going to preclude that motion.

5          I mean, whether it's -- you'll have to consider whether

6    it's premature in light of the evidence, et cetera, et cetera,

7    et cetera.  But if that's what you want to do, um -- you know,

8    nothing in my order, this order, alone, will preclude that.

9    That's not to say that it may or may not be appropriate,

10   timely, et cetera, et cetera.  But I'm not ruling on that right

11   now.

12         **MS. GILBRIDE:**  May I be heard on one other question,

13   Your Honor?

14         **THE COURT:**  Yes.

15         **MS. GILBRIDE:**  Understanding what you've said about

16   discovery, it doesn't sound that you would be entertaining a

17   motion for conditional certification at this point.  So I just

18   want to preserve or figure out what that does with the question

19   about the statute of limitations.

20         Would we wait, and then when the time comes, if and when

21   the time comes to file a motion for conditional certification,

22   then we would ask for equitable tolling back to some previous

23   day, whether it's the date you --

24         **THE COURT:**  What is the power of the court to order

25   equitable tolling, retrospectively?

1          **MS. GILBRIDE:**  It's discretionary.  And basically, in

2   the context of the FLSA, courts will do it when the progress of

3   litigation -- often it's appeals, either in the underlying case

4   or a related case -- cause a stay in the litigation before that

5   court.

6          **THE COURT:**  And the Court also has the discretion to

7   issue that, prospectively.  Correct?

8          **MS. GILBRIDE:**  Yes.  Yes.  That's correct.  So I had

9   asked for it to be done now, in the event that a stay was

10  granted.  But since you're granting the stay only partially,

11  I'm not sure whether it's a point we should raise now or wait.

12         **THE COURT:**  Well, the important point is that I am

13  staying the case in terms of -- I am not giving you permission

14  to move to certify the class at this point.  And therefore, it

15  seems to me it goes hand in hand that an equitable tolling

16  order should go along with that.  Because now I'm precluding

17  you from certifying the class, which would protect the statute

18  of limitations.

19         So I'm going to -- since my stay is limited to the extent

20  that it's going allow for discovery, not for plaintiffs'

21  motions work like certifying the class, moving for summary

22  judgment, moving for trial, et cetera, et cetera, at least

23  until I change the scope of the stay, I'm going to in my order

24  order equitable tolling, commensurate with my limitations that

25  I just stated.

1          **MS. GILBRIDE:**  Thank Your Honor.

2          **THE COURT:**  Okay?  All right.

3      So what I would like to do is schedule a further status to

4  see where things are at with respect to what's going on, and

5  with respect to Ninth Circuit.  Let's set that.

6      You say the last reply brief is not due until May?

7          **MS. GILBRIDE:**  That's correct.

8          **THE COURT:**  That's an extended period.  Why don't we

9  schedule a further status conference for July, and see if

10  there's been some progress at the Ninth Circuit, whether oral

11  argument has been set, or anything else coming out of the

12  Circuit that might indicate how quickly they might move.

13      So Angie, something in late July, maybe?

14          **THE CLERK:**  Late July.

15          **THE COURT:**  Or mid to late July.

16          **THE CLERK:**  July 23rd, Your Honor.

17          **THE COURT:**  Okay.  July 23rd.  At 10:30.

18      (Off-the-Record discussion between counsel)

19          **THE COURT:**  All right.  I will formally take the

20  matter under submission and get out an order.

21          **MR. GEGA:**  Your Honor, just a procedural point.  Just

22  a procedural question or a scheduling question with respect to

23  your status conference on July 23rd.

24      Is it possible that could be scheduled for 1:30 instead of

25  10:30?  So it would enable us to basically have a one-day

1   travel and appearance situation.

2          **THE COURT:**  Yeah, how about 1:00?  Because I have law

3   and motion, so let's do it at 1:00.

4          **MS. SILVA:**  Unless you do these hearings, and allow

5   for a telephone conference.

6          **THE COURT:**  I could, if there's not much new to

7   report.

8          **MS. SILVA:**  Okay.

9          **THE COURT:**  But I don't know that.  And if we get

10  into a thing about -- it gets more complicated, then it's

11  probably better to be live.

12      But I'll set it at 1:00, either way.  And if it looks like

13  there's not much to report, we can even do that by telephone.

14         **MS. SILVA:**  1:30 or 1:00?  Sorry.

15         **THE COURT:**  1:00.  All right?

16         **MR. GEGA:**  Thank Your Honor.

17         **MS. GILBRIDE:**  Thank you.

18         **THE COURT:**  Great, thank you.

19         **MS. DE CASTRO:**  Thank you, Your Honor.

20         **THE CLERK:**  Court is adjourned.

21      (Proceedings concluded)

22

23

24

25

1

2

3

4           **CERTIFICATE OF REPORTER**

5      I, BELLE BALL, Official Reporter for the United States

6 Court, Northern District of California, hereby certify that the

7 foregoing is a correct transcript from the record of

8 proceedings in the above-entitled matter.

9

10 *Belle Ball*

11               /s/ Belle Ball

12          Belle Ball, CSR 8785, CRR, RDR

13           Monday, February 24, 2020

14

15

16

17

18

19

20

21

22

23

24

25