**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DARIO MARTINEZ-GONZALEZ, on behalf of himself and other aggrieved employees, *Plaintiff-Appellee*, | No. 19-17311 |
| | D.C. No. 3:18-cv-05226-EMC |
| v. | |
| ELKHORN PACKING CO. LLC; D'ARRIGO BROS. CO. OF CALIFORNIA, *Defendants-Appellants.* | OPINION |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted February 1, 2021
San Francisco, California

Filed November 3, 2021

Before: Eugene E. Siler,[*] Johnnie B. Rawlinson, and
Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Bumatay;
Dissent by Judge Rawlinson

---

[*] The Honorable Eugene E. Siler, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Arbitration / California Law

The panel reversed the district court's order refusing to enforce arbitration agreements between Dario Martinez-Gonzalez and his former employers in an action alleging violations of federal and state labor and wage laws.

Elkhorn Packing Company is a farm labor contractor for D'Arrigo Brothers, a California-based grower of vegetables. As part of Elkhorn's orientation for incoming employees, Martinez-Gonzalez signed employment paperwork that included arbitration agreements. The district court held that the arbitration agreements resulted from undue influence and economic duress, and therefore the agreements were invalid and unenforceable.

The panel held that under California law, the doctrine of economic duress did not render the arbitration agreements unenforceable because Elkhorn did not commit a wrongful act and reasonable alternatives were available to Martinez-Gonzalez. Martinez-Gonzalez asserted that Elkhorn committed a wrongful act by asking him to sign the arbitration agreement after he made the journey from Mexico to California, where he was dependent on Elkhorn housing and had already started harvesting lettuce. The panel held that, while the circumstances surrounding the signing of the agreements were not ideal, they did not constitute a "wrongful act" under California law. The panel held further that Martinez-Gonzalez also failed to

_____

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

demonstrate a lack of reasonable alternatives where the agreements themselves did not say they were necessary for him to keep his job, no one at Elkhorn told Martinez-Gonzalez that refusing to sign the agreements was a cause for termination, and Martinez-Gonzalez admitted that no one at Elkhorn told him he would be terminated if he did not sign the agreements.  With no threat of termination or express statement that the agreements were mandatory, it was clearly erroneous for the district court to conclude that Martinez-Gonzalez lacked a reasonable alternative – such as asking whether he could decline to sign the agreements.  Furthermore, Martinez-Gonzalez had another reasonable alternative – to revoke the arbitration agreements.

The doctrine of "undue influence" can be used to rescind an agreement under California law.  The panel held that the economic duress doctrine is employed only in limited circumstances, and here there was no reason to invoke this last resort given the lack of wrongful actions, the existence of reasonable alternatives,  and  Martinez-Gonzalez's continued ability to vindicate his interests in arbitration.  Martinez-Gonzalez did not show undue susceptibility where the facts did not support a finding that he was especially vulnerable to pressure.  Given the lack of heightened susceptibility, Martinez-Gonzalez had to establish that "extraordinary force" was brought against him to prove undue influence.  The panel held that the conditions here, while not ideal, were a far cry from actions considered "oppressive" under California law where: the timing and place of the orientation did not show that Martinez-Gonzalez's will was overborne; the lack of time to consult with attorneys or read the agreements did not improperly induce Martinez-Gonzalez's signatures since Elkhorn did not interfere with his ability to use either option; Elkhorn's representatives' instructions to sign the agreements quickly

were not insistent demands; and Elkhorn representatives' general statements to follow the company's rules and directions had nothing to do with the arbitration agreements. Given the totality of the circumstances, the panel held that the district court clearly erred in finding undue influence here.

The panel remanded to the district court to determine whether Martinez-Gonzalez's claims fell within the scope of the arbitration agreements.

Judge Rawlinson dissented because the majority completely disregarded the district court's comprehensive factual findings following trial and the clear error standard of review. She agreed with the district court because the district court did not clearly err in concluding, after a bench trial, that the atmosphere surrounding the arbitration agreements rose to the level of a wrongful act. In addition, the district court's finding of economic duress was amply supported by the evidence developed during trial, and the majority's contrary finding was not.

## COUNSEL

Regina Silva (argued), Atkinson Andelson Loya Ruud Romo, La Jolla, California; Geoffrey F. Gega, Law Offices of Geoffrey Gega, Santa Ana, California; for Defendants-Appellants.

Karla Gilbride (argued) and Rodolfo Padilla, Public Justice P.C., Washington, D.C.; Ana Vicente de Castro and Josephine B. Weinberg, California Rural Legal Assistance Inc., Salinas, California; for Plaintiff-Appellee.

Bruce Goldstein, Iris Figueroa, and Gabriela Hybel, Farmworker Justice, Washington, D.C., for Amicus Curiae Farmworker Justice.

---

## OPINION

BUMATAY, Circuit Judge:

For three consecutive lettuce-harvesting seasons, Dario Martinez-Gonzalez worked as a farm laborer for Elkhorn Packing Company and D'Arrigo Brothers (collectively, "Elkhorn"). After quitting his job in the middle of the third season, Martinez-Gonzalez sued his former employers, alleging violations of federal and state labor and wage laws. Elkhorn later moved to compel arbitration under agreements signed by Martinez-Gonzalez after he traveled to the United States and started harvesting lettuce. The district court refused to enforce the arbitration agreements, holding that Martinez-Gonzalez signed them under economic duress and undue influence. We reverse and remand.

## I.

Elkhorn Packing Company is a farm labor contractor for D'Arrigo Brothers, a California-based grower of vegetables. In 2015, Martinez-Gonzalez resided in Mexicali, Mexico, supporting his wife and their parents, when he learned about an opportunity to work for Elkhorn in the United States. A job at Elkhorn paid up to five times as much as Martinez-Gonzalez earned in Mexico. In 2016, Elkhorn accepted Martinez-Gonzalez's application and helped him obtain an H-2A temporary agricultural worker visa. Elkhorn then transported Martinez-Gonzalez to Monterey County, California, to start the job.

Elkhorn held orientations for incoming employees.  For Martinez-Gonzalez, the orientation did not occur until a few days after he began harvesting lettuce in the fields.  The orientation took place at the end of the workday, at around 4 p.m., in a hotel parking lot.  At the orientation, some 150 workers were asked to sign employment paperwork.  To facilitate the signing of the paperwork, Elkhorn representatives directed employees to form lines, where they stood—in at least one case for 40 minutes—and waited to sign the packages.  Once at the front of the line, an Elkhorn representative told each employee where to sign while flipping through the pages.  Representatives urged employees to hurry so that others could have a chance to sign.

The employment package included an arbitration agreement.  The agreement required employees to resolve all disputes with Elkhorn by arbitration.  The agreement was written in Spanish, Martinez-Gonzalez's native language.  Martinez-Gonzalez signed the arbitration agreement without reading it.  Elkhorn representatives didn't explain the contents of the arbitration agreement to Martinez-Gonzalez,[1] didn't give him a copy of the agreement, and didn't tell him he could consult an attorney before signing it.  On the other hand, Martinez-Gonzalez didn't ask for a copy of the agreement, attorney consultation, or time to read the agreement.  All sides agree that Elkhorn never expressly told Martinez-Gonzalez that he had to sign the agreement to keep working for the company.

---

[1] The district court credited Martinez-Gonzalez's testimony that he received no explanation of the agreement, although Elkhorn disputes this.

Martinez-Gonzalez completed the 2016 season and traveled back to Mexico on Elkhorn-funded transportation. For the 2017 season, Martinez-Gonzalez again harvested lettuce for Elkhorn in Monterey County, California.[2]  He also signed an arbitration agreement for the 2017 season. But Martinez-Gonzalez didn't finish the 2017 season.  He quit Elkhorn mid-season and returned to Mexico on his own.

In 2018, Martinez-Gonzalez sued Elkhorn in California state court on behalf of himself and other similarly situated workers, alleging a failure to pay federal minimum wages under the Fair Labor Standards Act, and state-law claims related to meals, wages, rest periods, and privacy.  Elkhorn removed the case to federal district court and moved to compel arbitration under the two arbitration agreements. The district court held a two-day bench trial to determine the enforceability of the agreements and concluded that they resulted from undue influence and economic duress.  The district court accordingly held the agreements invalid and unenforceable and denied the employers' motion to compel. Elkhorn appeals to this court.

## II.

The Federal Arbitration Act provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  In determining the enforceability of an arbitration agreement, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2."  *Nagrampa  v.*

---

[2] In between the two seasons, Martinez-Gonzalez worked another season for Elkhorn in Yuma, Arizona.

*MailCoups, Inc.*, 469 F.3d 1257, 1268 (9th Cir. 2006) (simplified). State contract law governs this inquiry. *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 716 (9th Cir. 2020). We review the enforceability of an arbitration agreement de novo, but the factual findings underlying the district court's decision for clear error. *Nagrampa*, 469 F.3d at 1267–68.

## A.

In California, a contract signed under economic duress may be rescinded. *See* Cal. Civ. Code § 1689(b)(1). Economic duress occurs when one party commits a (1) "wrongful act" and (2) that act "is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative" to agree to an unfavorable contract. *Perez v. Uline, Inc.*, 157 Cal. App. 4th 953, 959 (2007) (simplified). Economic duress also requires (3) causation: "[a] contract cannot be rescinded when it appears that consent would have been given . . . notwithstanding the duress[.]" *In re Cheryl E.*, 161 Cal. App. 3d 587, 600 (1984); *see also* Judicial Council of California Civil Jury Instructions § 333, Affirmative Defense—Economic Duress (2020) (establishing three elements for economic duress).

The doctrine of economic duress does not prohibit "[s]imple hard bargaining." *Sheehan v. Atlanta Int'l Ins. Co.*, 812 F.2d 465, 469 (9th Cir. 1987). Instead, it is "designed to preclude the wrongful exploitation of business exigencies to obtain disproportionate exchanges of value." *Id.* (simplified). While the doctrine guards against "economic exploitation," it doesn't interfere with the "notion of freedom of contract" or "the desirability of finality of private dispute resolution." *Id.* The doctrine is one of "last resort," to be used only absent "conventional alternatives and remedies." *Rich & Whillock, Inc. v. Ashton Dev., Inc.*,

157 Cal. App. 3d 1154, 1159 (1984); *see* Grace M. Giesel, *A Realistic Proposal for the Contract Duress Doctrine*, 107 W. Va. L. Rev. 443, 463–64 (2005) (noting that, in the 88 published cases nationwide on economic duress between 1996 and 2003, only nine were decided in favor of the claim). The party seeking rescission bears the burden of proving economic duress. *See Saheli v. White Mem. Med. Ctr.*, 21 Cal. App. 5th 308, 324 (2018).

Because Elkhorn did not commit a wrongful act and reasonable alternatives were available to Martinez-Gonzalez, we hold that the doctrine of economic duress does not render the arbitration agreements unenforceable.

## 1.

Martinez-Gonzalez has not established that Elkhorn engaged in any "wrongful act" under California law. While "wrongful acts" for economic duress need not be unlawful or tortious, *Chan v. Lund*, 188 Cal. App. 4th 1159, 1173 (2010), they are limited to actions that "make a mockery of freedom of contract and undermine the proper functioning of our economic system," *Rich & Whillock*, 157 Cal. App. 3d at 1159. Examples of such wrongful acts include the assertion of a false claim, a bad faith threat to breach a contract, and a threat to withhold payment of an acknowledged debt. *CrossTalk Prods. Inc. v. Jacobson*, 65 Cal. App. 4th 631, 645 (1998). California courts have also adopted the Restatement of Contracts' definition of wrongful acts:

> Impermissible threats include bad faith threatened use of civil process; threats which are a breach of the duty of good faith and fair dealing under a contract with the recipient; threats which would harm the recipient

without significantly benefitting the party making the threat; or threats where "what is threatened is otherwise a use of power for illegitimate ends."

*Philippine Exp. & Foreign Loan Guarantee Corp. v. Chuidian*, 218 Cal. App. 3d 1058, 1077 (1990) (citing Restatement (Second) of Contracts, § 176 (Am. L. Inst. 1981)). Thus, wrongful acts require more than hard bargaining or tough business tactics. *Rich & Whillock*, 157 Cal. App. 3d at 1159. They must involve actions taken for a "coercive purpose" or "in bad faith." *Hester v. Pub. Storage*, 49 Cal. App. 5th 668, 679 (2020). Wrongful acts do not include arrangements that "serve a practical business function." *Id.*

Martinez-Gonzalez asserts that Elkhorn committed a wrongful act by asking him to sign the arbitration agreement after he made the journey from Mexico to California, where he was dependent on Elkhorn housing and already started harvesting lettuce. This conduct doesn't constitute a "wrongful act" under California law. First, Martinez-Gonzalez doesn't allege that Elkhorn's actions were unlawful or tortious. *See Chan*, 188 Cal. App. 4th at 1173. Second, the district court did not find that Elkhorn made any false claim, bad-faith threat, or refusal to repay its debt. *See CrossTalk*, 65 Cal. App. 4th at 645. Third, Elkhorn's actions do not fit the description of "[i]mpermissible threats" identified by the Restatement. *See Chuidian*, 218 Cal. App. 3d at 1077. Finally, while the district court found that the timing of the orientation program disadvantaged Martinez-Gonzalez, it didn't conclude that Elkhorn had a "coercive purpose" or acted "in bad faith" in asking him to sign the

arbitration agreements after his arrival in the United States. *See Hester*, 49 Cal. App. 5th at 679.[3]

In sum, while the circumstances surrounding the signing of the agreements were not ideal, they didn't make "a mockery of [the] freedom of contract [or] undermine the proper functioning of our economic system." *See Rich & Whillock*, 157 Cal. App. 3d at 1159. In fact, the district court acknowledged that the orientation's location served a "practical business function," *Hester*, 49 Cal. App. 5th at 679, as a "convenient place" to gather hundreds of farm workers in a "single, unified orientation." *Martinez-Gonzalez v. Elkhorn Packing Co., LLC*, No. 18-cv-05226-EMC, 2019 WL 5556593, at *3, *10 (N.D. Cal. Oct. 29, 2019). Construing the signing of the arbitration agreements here as a wrongful act would place courts in charge of determining business necessities and would encumber, rather than promote, the "freedom of contract." *Rich & Whillock*, 157 Cal. App. 3d at 1159.

And contrary to Martinez-Gonzalez's assertions, *Rich & Whillock* doesn't help his case. There, the contractor forced a subcontractor to accept a fraction of the full amount of a debt owed, knowing that the subcontractor needed the money or would be forced into "imminent bankruptcy." *Id.* at 1160. This was a classic case of economic duress because the contractor intentionally threatened the subcontractor

---

[3] Contrary to the dissent's assertion, the district court never found that Elkhorn acted with a "coercive purpose" in arranging the orientation. Dissent at 35. While the district court observed that the circumstances of the orientation made for a "coercive environment," *Martinez-Gonzalez v. Elkhorn Packing Co., LLC*, No. 18-cv-05226-EMC, 2019 WL 5556593, at *11 (N.D. Cal. Oct. 29, 2019), it did not contend that Elkhorn created this environment for a "coercive purpose" or in "bad faith," as California law requires. *Hester*, 49 Cal. App. 5th at 679.

with "economic disaster" by withholding the total undisputed debt. *Id.* at 1161; *see also id.* at 1157 (noting that subcontractor believed the threat was "blackmail" and "sign[ed] it only because [it] had to in order to survive"). Here, even though Martinez-Gonzalez signed the arbitration agreement a few days after starting work, Elkhorn never threatened to withhold his wages.

Finally, we question whether extracting an arbitration agreement could constitute a "wrongful threat" under California law. A wrongful threat involves "the wrongful exploitation of business exigencies to obtain disproportionate exchanges of value." *Id.* Here, Elkhorn didn't ask Martinez-Gonzalez to work for disproportionately low wages, to forgo earned wages, or to disclaim any claims against it. Instead, it asked him to sign a commonplace agreement to bring disputes to an arbitrator—a lawful agreement encouraged by California law. *See Desert Outdoor Advert. v. Sup. Ct.*, 196 Cal. App. 4th 866, 872 (2011) (providing that California "courts will indulge every intendment to give effect to arbitration clauses"). Martinez-Gonzalez doesn't allege, and it's difficult to surmise, what "value" he lost from entering such an agreement. In the few California cases finding a "wrongful threat," the exploitation involved the disproportionate loss of *economic* value, such as the loss of over $20,000 on a $72,000 debt, *Rich & Whillock*, 157 Cal. App. 3d at 1156–57, 1161; the extraction of an easement and fees totaling over $339,000, *Uniwill v. City of Los Angeles*, 124 Cal. App. 4th 537, 539–40, 545 (2004); or an attempt to foreclose on a person's home, *Leeper v. Beltrami*, 53 Cal. 2d 195, 203–05 (1959). On the other hand, a California court found no "wrongful threat" when a company invoked a "null and void" clause to rescind a sale when the clause served a "practical business function"—even if it caused significant economic harm to

the buyer. *Hester*, 49 Cal. App. 5th at 679. We are aware of no case under California law in which the signing of an arbitration agreement was considered so "disproportionate" as to require the last resort of economic duress.

So, even without disturbing any of the district court's findings of fact, Martinez-Gonzalez has not shown a "wrongful act" under California law. The dissent disagrees largely based on Martinez-Gonzalez's socioeconomic background. *See* Dissent at 32–34. Like the dissent, we are sympathetic to Martinez-Gonzalez's economic situation and in no way diminish his circumstances. But we must be guided by the law, not our sympathies. Our review of California law shows that the above facts do not amount to "wrongful conduct." Neither the district court nor the dissent cite a single California authority showing that similar facts constitute wrongful conduct. And our role is to follow California law, not make up our own. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 839 (9th Cir. 2020) ("[F]ederal courts exercising diversity jurisdiction must follow state substantive law[.]").

## 2.

Martinez-Gonzalez also failed to demonstrate a lack of reasonable alternatives, and it was clearly erroneous for the district court to find otherwise. A reasonable alternative is one that "a reasonably prudent person would follow" to avoid a coerced agreement. *CrossTalk Prods.*, 65 Cal. App. 4th at 644. When such alternatives are available, a party cannot establish economic duress because there is "no compelling necessity" to submit to the inappropriate pressure. *Id.* "Merely being put to a voluntary choice of perfectly legitimate alternatives is the antithesis of duress." *In re Exec. Life Ins. Co.*, 32 Cal. App. 4th 344, 391 (1995).

It is *not* a reasonable alternative to be forced into bankruptcy, financial ruin, or selling one's home. *Rich & Whillock*, 157 Cal. App. 3d at 1159; *Leeper*, 53 Cal. 2d at 205. But the need for "a job and . . . the money offered under the agreement . . . does not equate to economic duress." *Uline*, 157 Cal. App. 4th at 960. Otherwise, economic duress would apply to "almost any case." *Id.* Even if rejecting an agreement leads to the loss of some income, that is not enough to establish the lack of reasonable alternatives since a party "could presumably make up for the[] lost . . . opportunities elsewhere." *Hester*, 49 Cal. App. 5th at 680. And speculation about unfavorable outcomes cannot show economic duress—nor can the failure to revoke an agreement when doing so is permitted. *Lanigan v. City of Los Angeles*, 199 Cal. App. 4th 1020, 1034 (2011). Whether a party "acted as a reasonably prudent person is a question of fact." *Leeper*, 53 Cal. 2d at 205.

The district court found that Martinez-Gonzalez lacked reasonable alternatives to signing the arbitration agreements because his challenging financial situation required him to keep his job with Elkhorn. In the district court's view, Martinez-Gonzalez's options were limited because he (mistakenly) believed his work visa only allowed him to work for Elkhorn and he was dependent on Elkhorn for housing and transportation back to Mexico. Elkhorn's repeated admonishments to follow its rules, the district court said, also demonstrated the lack of reasonable alternatives.

But these circumstances do not show a lack of reasonable alternatives since Martinez-Gonzalez could have simply asked whether signing the arbitration agreements was necessary for him to keep his job. First, the agreements themselves did not say that they were mandatory. Second, no one at Elkhorn told Martinez-Gonzalez that refusing to

sign the agreements was a cause for termination.  In fact, the district court found otherwise—while the district court said that some of the trial testimony "suggest[ed] that it was implied to workers that signing the Arbitration Agreement was mandatory," *Martinez-Gonzalez*, 2019 WL 5556593, at *6, it found that Elkhorn never expressly told Martinez-Gonzalez that he had to sign the agreement to keep his job.  *Id.* at *33.  Third, Martinez-Gonzalez himself admitted that no Elkhorn representative ever told him he would be terminated if he did not sign the agreements.  Instead, he testified that he signed the agreements, not out of fear of losing his job, but because he was tired and hungry and told to hurry.  But "[e]ncouragement is a far cry from coercion or denial of choice." *In re Exec. Life Ins. Co.*, 32 Cal. App. 4th at 391.  At his deposition, Martinez-Gonzalez conceded it was his "assumption" that the agreements were mandatory.  We do not think a "reasonably prudent person" would just assume an agreement is mandatory—at least not without someone saying so or even asking.**[4]**

With no threat of termination or express statement that the agreements were mandatory, it was clearly erroneous to conclude that Martinez-Gonzalez lacked a reasonable alternative—such as asking whether he could decline to sign the agreements.  The district court and dissent contend that these facts don't matter because Martinez-Gonzalez subjectively *believed* the arbitration agreements were mandatory.  Dissent at 37–38.  But, under California law, a

---

**[4]** The dissent concludes that Martinez-Gonzalez "had no meaningful opportunity to ask questions" about the arbitration agreements.  Dissent at 41.  But this factual finding is nowhere in the district court's order.  To the contrary, the district court acknowledged that "Elkhorn supervisors stated that . . . employees were invited to ask questions about the documents." *Martinez-Gonzalez*, 2019 WL 5556593, at *6.

party's speculation about his termination, even if justified or "highly likely," cannot be used to prove the lack of reasonable alternatives. *See Lanigan*, 199 Cal. App. 4th at 1034 (economic duress cannot be established when an officer signed a settlement agreement because of fear of losing his job and livelihood, when his termination was "not a certainty"). After all, California law applies a "reasonably prudent person" standard—an objective standard. *See* 14 Cal. Jur. 3d Contracts § 131 ("[U]nder California law, courts employ an objective test to determine whether a reasonable alternative was available.").[5]

Furthermore, Martinez-Gonzalez had another reasonable alternative—to revoke the arbitration agreement. As the district court found, the arbitration agreements expressly allowed Martinez-Gonzalez to revoke the contract within ten days. Nothing shows that Elkhorn interfered with Martinez-Gonzalez's right to revoke the agreements if he felt that the orientation's setting was too coercive. Under California law, economic duress cannot be met when a party had the option to—but failed to—revoke an agreement within the revocation period. *See Lanigan*, 199 Cal. App. 4th at 1034. Martinez-Gonzalez claims he didn't know he could revoke the agreements because he never read them, but a "cardinal rule of contract law" in California is that "a party's failure to read a contract . . . before signing it is no defense to the contract's enforcement." *Desert Outdoor Advertising*,

---

[5] It is unfortunate that the dissent misconstrues this analysis as our suggesting that "'facts don't matter' to [her]." Dissent at 38. We would never criticize our dissenting colleague in such a manner. We respect her too much. Our point was merely to highlight our disagreement in analyzing the facts. Here, the dissent and district court think Martinez-Gonzalez's subjective beliefs are more important than the objective lack of threats of termination. As stated above, this contradicts California law.

196 Cal. App. 4th at 872; *see also Brown v. Wells Fargo Bank, N.A.*, 168 Cal. App. 4th 938, 959 (2008) ("[I]t is not reasonable to fail to read a contract[.]" (emphasis omitted)).[6]

As an appellate court, we hesitate to overturn a district court's factual findings. But where, as here, we are firmly convinced the district court overlooked key facts, it is our duty to reverse. *See Myers v. United States*, 652 F.3d 1021, 1036 (9th Cir. 2011) (holding that findings of fact were clearly erroneous where the district court "simply ignored" contrary evidence in the record).[7]

\* \* \*

The economic duress doctrine is employed "reluctant[ly]" and "only in limited circumstances." *Uline*, 157 Cal. App. 4th at 959. Here, there is no reason to invoke this "last resort" given the lack of wrongful actions, the existence of reasonable alternatives, and Martinez-Gonzalez's continued ability to vindicate his interests in arbitration. *See Rich & Whillock*, 157 Cal. App. 3d at 1159 (holding that economic duress does not apply when "conventional alternatives and remedies" are still available).

---

[6] The dissent asserts that Elkhorn did not allow Martinez-Gonzalez to read the arbitration agreements. Dissent at 33. This is simply not accurate. The district court never made such a finding, and for good reason: Martinez-Gonzalez testified that no one from Elkhorn ever told him he could not read the agreements. In fact, he even said he had no intent to read the agreement at the time.

[7] Because Martinez-Gonzalez's economic duress argument fails under the wrongful act and reasonable alternative elements, we do not reach the doctrine's causation requirement. *See In re Marriage of Baltins*, 212 Cal. App. 3d 66, 84 (1989) ("The coercion must induce the assent of the coerced party, who has no reasonable alternative to succumbing.").

As a result, we disagree with the district court that Martinez-Gonzalez established economic duress.

## B.

Like economic duress, the doctrine of "undue influence" can be used to rescind an agreement under California law. *See* Cal. Civ. Code § 1689(b)(1). By statute, undue influence results from three scenarios:

> (1) In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him;

> (2) In taking an unfair advantage of another's weakness of mind; or

> (3) In taking a grossly oppressive and unfair advantage of another's necessities or distress.

Cal. Civ. Code § 1575. Undue influence, however, "cannot be used as a pretext to avoid bad bargains or escape from bargains which refuse to come up to expectations." *Odorizzi v. Bloomfield Sch. Dist.*, 246 Cal. App. 2d 123, 132 (1966). Courts must instead undertake the "difficult[]" task of "determining when the forces of persuasion have overflowed their normal banks and become oppressive flood waters." *Id.*

Essentially, undue influence involves "the use of excessive pressure to persuade one vulnerable to such pressure." *Id.* at 131. The doctrine consists of two elements: (1) "undue susceptibility in the servient person" and (2) "excessive pressure by the dominating person." *Id.*; *see*

*also Das v. Bank of Am.*, 186 Cal. App. 4th 727, 743 (2010) (undue influence requires one party to "t[ake] some advantage of the mental weakness or incapacity of the other party").  The two elements act in balance.  If either exists to a large degree, the second need not be so great.  *See Odorizzi*, 246 Cal. App. 2d at 132 ("Whether a person of subnormal capacities has been subjected to ordinary force or a person of normal capacities subjected to extraordinary force, the match is equally out of balance.").  The result, however, must be that the "will of the servient person being in fact the will of the dominant person."  *Id.* at 131.

Once again, the party seeking rescission bears the burden of proving undue influence.  *Saheli*, 21 Cal. App. 5th at 324.  Undue influence is a question of fact.  *See Keithley v. Civ. Serv. Bd.*, 11 Cal. App. 3d 443, 451–52 (1970).

### 1.

We first turn to the "undue susceptibility" element.  Susceptibility means "a lessened capacity" of a party "to make a free contract."  *Odorizzi*, 246 Cal. App. 2d at 131.  It may consist of wholesale mental incapacitation, but also extends to "a lack of full vigor due to age, physical condition, emotional anguish, or a combination of such factors."  *Id.* (simplified).  These situations "usually involve[] elderly, sick, [or] senile persons."  *Id.*  The result is the "inability to act with unencumbered volition."  *Keithley*, 11 Cal. App. 3d at 451.  Martinez-Gonzalez cannot show such undue susceptibility.

The district court made no explicit finding that Martinez-Gonzalez was especially vulnerable to pressure.  And the facts don't support such a finding.  As the district court found, Martinez-Gonzalez had a secondary-school education and could read and write in Spanish.  Martinez-

Gonzalez had been an agricultural worker since he was six-years old and was the bread winner for his family.  Martinez-Gonzalez provided housing and medical care for his wife, his mother, his now-deceased stepfather, and his diabetic mother-in-law.

So, Martinez-Gonzalez's financial situation didn't show that he was unable "to act with unencumbered volition."  *Id.* While Martinez-Gonzalez may come from a modest socioeconomic background, he was able to support himself and his family prior to working for Elkhorn.  And the record doesn't reflect that he couldn't continue to do so after working for Elkhorn.  Indeed, the fact that Martinez-Gonzalez voluntarily quit his Elkhorn job in 2017 confirms that he had no undue susceptibility.  So, without more, his economic situation doesn't establish a "weakness of mind," significant "necessities or distress," or the placement of such "confidence" in Elkhorn to establish a claim for undue influence.  *See* Cal. Civ. Code § 1575.

**2.**

Next is the "excessive pressure" element.  Given the lack of any heightened susceptibility, Martinez-Gonzalez had to establish that "extraordinary force" was brought to bear against him to prove undue influence.  *See Odorizzi*, 246 Cal. App. 2d at 132.  Factors that may show the presence of excessive pressure include:

> (1) discussion of the transaction at an unusual or inappropriate time, (2) consummation of the transaction in an unusual place, (3) insistent demand that the business be finished at once, (4) extreme emphasis on untoward consequences of delay, (5) the use of multiple persuaders by the dominant side

> against a single servient party, (6) absence of
> third-party advisers to the servient party,
> (7) statements that there is no time to consult
> financial advisers or attorneys.

*Id.* at 133. Although excessive pressure "usually involves several" of these factors, *id.*, "there are no fixed definitions or inflexible formulas." *Keithley*, 11 Cal. App. 3d at 451. Instead, courts analyze "the entire context" to determine whether "one's will was overborne." *Id.*

On this element, the district court found excessive pressure. In making this finding, the district court relied on (1) the unusual time and place of the orientation—both because it was held after Martinez-Gonzalez traveled to the United States and because it occurred in a hotel parking lot with no chairs; (2) the lack of time to read the agreement in advance or consult an attorney; (3) the pressure to sign the agreements quickly after a long day's work; and (4) statements from Elkhorn supervisors exhorting workers to follow the company's rules.[8]

We find it implausible that these facts amount to "excessive pressure." The conditions here, while not ideal,

---

[8] We disagree with the dissent that this inquiry can be reduced to a simple box-checking exercise of *Odorizzi* factors. *See* Dissent at 44. Even if the district court made findings on five of the seven *Odorizzi* factors, we still must determine whether the facts can support a finding of undue influence under California law.

On appeal, Martinez-Gonzalez also claims that Elkhorn falsely represented that the agreements related to "Social Security." This is a contested factual dispute, and the district court made no finding that Elkhorn made any fraudulent or false statements. We therefore do not consider this argument.

are a far cry from actions considered "oppressive" under California law.    Compare *Odorizzi*'s three examples of oppressive actions:

- Approaching a pregnant woman about her late husband's estate four days after he was shot to death, while she was still in shock;

- Seeking the release of claims from a patient who was confined to a cast in a hospital, hysterical, and in significant pain; and

- Arriving at a person's home at 1 a.m. unannounced and insisting on the signing of a document immediately or letting a real estate transaction fall apart.

*Odorizzi*, 246 Cal. App. 2d at 133–34.  When viewing the entire context, the conditions in this case don't come close to those examples.[9]

First, the timing and place of the orientation do not show that Martinez-Gonzalez's will was overborne.  While it may be atypical for workers to sign employment documents in a hotel parking lot, Elkhorn runs an agricultural business, growing vegetables in remote farmlands, and the parking lot was conveniently located at the workers' hotel.  And as discussed above, the business practicalities of employing

---

[9] Despite the dissent's assertion to the contrary, we do not suggest that these examples represent "the universe of circumstances" constituting undue influence.  Dissent at 44–45.  Rather, they illustrate the sort of extreme pressure that California courts consider as "extraordinary force."  *Odorizzi*, 246 Cal. App. 2d at 132.  Once again, we must follow California law, not our own view of what the law should be.

over a hundred foreign workers easily explain why Elkhorn waited for the workers to arrive in the United States before asking them to sign the employment packets. Nothing indicates that the orientation was a "high pressure" tactic— "a pressure which works on mental, moral, or emotional weakness"—aimed at extracting arbitration agreements. *Keithley*, 11 Cal. App. 3d at 451. Indeed, although Martinez-Gonzalez said he was tired and hungry when he signed the agreements, we do not think this amounts to the "oppressive" conditions required for undue influence.

Second, the lack of time to consult with attorneys or read the agreements did not improperly induce Martinez-Gonzalez's signature since Elkhorn didn't interfere with his ability to use either option. While it would have been better to affirmatively offer each worker time to read the agreement or to consult an attorney, Elkhorn did not preclude Martinez-Gonzalez from asking for such time or consultation. *See Robison v. City of Manteca*, 78 Cal. App. 4th 452, 458 (2000) (holding that circumstances did not "approach[] undue influence" when nothing prevented a party from taking the time to read the agreement or consult an attorney). Moreover, Martinez-Gonzalez testified that he did not believe he needed to read the agreement or consult an attorney before signing the agreement.

Third, Elkhorn representatives' instructions to sign the agreements quickly were hardly "insistent demand[s] that the business be finished at once." *Odorizzi*, 246 Cal. App. 2d at 133. As the district court found, Elkhorn urged the workers to hurry in signing the paperwork, not out of some bad-faith pressure tactic, but to accommodate other employees also waiting to complete the forms. *See Martinez-Gonzalez*, 2019 WL 5556593, at *6 ("The supervisors who were present and assisting in the collection

24    MARTINEZ-GONZALEZ V. ELKHORN PACKING

of signatures in both 2016 and 2017 urged employees to hurry so that the people behind them in line could also sign the documents.").  Elkhorn's action, then, is nothing like the excessive pressure described in *Odorizzi*, when a party was told that an entire real estate transaction "would fall through if she did not sign then and there."  246 Cal. App. 2d at 134. It certainly doesn't reach an "extreme emphasis on [the] untoward consequences of delay"—another *Odorizzi* factor that may signal undue influence.  *Id.* at 133.

Fourth, Elkhorn representatives' general statements to follow the company's rules and directions had nothing to do with the arbitration agreements.  As the district court found, on Martinez-Gonzalez's first day on the job, an Elkhorn representative told him and other employees that it was a privilege to work for the company, that they should work diligently, and that they were free to return to Mexico if they did not want to work hard.  Other supervisors cautioned the employees to follow the company's rules.  We do not see how these standard first-day instructions could be construed as oppressive extortions to sign an arbitration agreement.

Given the totality of circumstances, we fail to see the extraordinary force needed to establish undue influence here. The district court clearly erred in finding otherwise.

\*  \*  \*

At bottom, the undue influence question is whether Martinez-Gonzalez's "will has been overcome against [his] judgment."  *Odorizzi*, 246 Cal. App. 2d at 132.  Under California law, parties "must abide [by] the consequences of the risks inherent in managing [their] own affairs."  *Id.* (noting that a real estate purchase may not be rescinded simply because the seller "cultivated" the buyer's expectation—later shown to be mistaken—that the land

would "become another Palm Springs"). Because neither undue susceptibility nor excessive pressure appears here to any significant degree, it is implausible and unsupported by the record to find undue influence here.

**III.**

Martinez-Gonzalez has not shown that he signed the arbitration agreements under economic duress or undue influence. We therefore reverse and remand to the district court to determine whether Martinez-Gonzalez's claims fall within the scope of the arbitration agreement.

**REVERSED AND REMANDED.**

---

RAWLINSON, Circuit Judge, dissenting:

The majority reverses the district court's finding, following a bench trial, that Dario Martinez-Gonzalez (Martinez-Gonzalez), a migrant worker, was subjected to economic duress and undue influence in the circumstances surrounding his signing of Arbitration Agreements with his employer, Elkhorn Packing Company (Elkhorn).

Because the majority opinion gives short shrift to the standard of review, I will begin with a discussion of the applicable standard of review and then proceed to apply it to the compelling facts of this case.

We have set forth clear error as the applicable standard of review when considering a factual determination that an arbitration agreement was obtained through the use of economic duress or undue influence. *See Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1085 (9th Cir. 2020). We

also review findings of fact following a bench trial for clear error. *Olson v. United States by & through Dep't of Energy*, 980 F.3d 1334, 1337 (9th Cir. 2020). Credibility determinations made by the judge presiding over the trial are afforded "special deference." *Allen v. Iranon*, 283 F.3d 1070, 1078 n.8 (9th Cir. 2002).

After hearing extensive testimony, the district court found that Martinez-Gonzalez and another Elkhorn migrant worker testified credibly regarding the circumstances surrounding their employment with Elkhorn and the signing of the Arbitration Agreements. *See Martinez-Gonzalez v. Elkhorn Packing Co., LLC*, No. 18-cv-05226-EMC, 2019 WL 5556593, at *2 (N.D. Cal. Oct. 29, 2019). That testimony and other evidence established the following facts as found by the district court:

1. Martinez-Gonzalez signed Arbitration Agreements in 2016 and 2017.

2. Martinez-Gonzalez signed the Arbitration Agreements in the United States after he was transported from Mexico for a period of approximately twelve hours in a bus provided by Elkhorn.

3. Martinez-Gonzalez was not presented with the Arbitration Agreements while in Mexico, and was never provided an explanation of the import of the Arbitration Agreements.

4. During his employment with Elkhorn, the company provided Martinez-Gonzalez

with housing at a hotel and transportation between the fields and the hotel.

5.  In 2016 and 2017, Martinez-Gonzalez and the other migrant workers were directed to sign a stack of "new hire documents" that included the Arbitration Agreements.

6.  No "real explanation" was provided of the documents the migrant workers were directed to sign.

7.  The Arbitration Agreements were included within a stack of documents that also contained IRS forms, a food safety form, a workers compensation agreement, and other documents.

8.  The stack of documents was signed in the parking lot of the hotel where the migrant workers resided.

9.  The stack of documents was signed at the end of the day after the workers had worked a full day in the fields and when Martinez-Gonzalez was tired and hungry.

10. No seating was provided for the migrant workers, although the supervisors collecting the signatures were seated.

11. The migrant workers were directed to stand in a line and wait their turn to sign the documents.

12. Martinez-Gonzalez stood in line for approximately forty minutes before he reached the table where the documents were located.

13. Elkhorn supervisors flipped through the pages of the documents and directed Martinez-Gonzalez where to sign.

14. Elkhorn supervisors urged the migrant workers to hurry so that those still waiting could also sign the documents.

15. Martinez-Gonzalez was not provided copies of the Arbitration Agreements to review in advance or given an opportunity to read the Arbitration Agreements before signing them. Neither was he provided with copies of the documents after signing them. Rather, the documents were collected after they were signed.

16. The Arbitration Agreements contained no language indicating that the agreements were optional, and none of the Elkhorn supervisors informed Martinez-Gonzalez that the Arbitration Agreements were optional.

17. Martinez-Gonzalez was never informed that he could consult with an attorney before signing the Arbitration Agreements.

18. Martinez-Gonzalez reasonably believed that he had no option but to sign the documents presented to him to continue working for Elkhorn. He also believed that the H-2A visa limited him to working at Elkhorn.[1]

19. The testimony from several Elkhorn supervisors that the migrant workers were not required to sign the Arbitration Agreements to remain employed was not credible.

20. In the United States, Martinez-Gonzalez was able to earn five times as much as he would earn in Mexico.

21. Martinez-Gonzalez supported his wife, his mother, his step-father, and his mother-in-law.

*Id.* at *2–*7.

Because these factual findings were made by the district court after observing and listening to the witnesses testify, they are entitled to "special deference." *Allen*, 283 F.3d at 1078 n.8. And because the factual findings are rooted in the record developed during trial, they cannot be clearly erroneous. *See United States v. Bontemps*, 977 F.3d 909, 917 (9th Cir. 2020) (explaining that factual findings by a

---

[1] Amicus Farmworker Justice described vividly and in detail the systematic exploitation of migrant workers for the H-2A visa program.

district court are not clearly erroneous unless "illogical, implausible, or without support in the record").

After setting forth its extensive and detailed factual findings, the district court reached the legal conclusion that the Arbitration Agreements were unenforceable because they were the product of economic duress and undue influence. *See id.* at *8–*11.

The crux of the district court's determination was that Elkhorn's conscious decision to direct the migrant workers to sign the Arbitration Agreements after transporting them twelve hours from home, staging the signings in a parking lot with no seating after a day in the fields, and providing no explanation or opportunity to review the documents constituted the wrongful act required to support a claim of economic duress. *See id.* at *8–*10. The majority disagrees, concluding that Elkhorn committed no wrongful act, and that "reasonable alternatives were available to Martinez-Gonzalez." *Majority Opinion*, p. 9.

I disagree with the majority and agree with the district court, primarily because the district court did not clearly err in concluding, after a bench trial, that the atmosphere surrounding the signing of the Arbitration Agreements rose to the level of a wrongful act. *Martinez-Gonzalez*, 2019 WL 5556593, at *8. It is important to keep in mind that under California law, the wrongful act required to establish economic coercion need not constitute a tort or a crime. *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 3d 1154, 1158 (1984). Rather, all that is required is a "wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure." *Id.* (citations omitted).

California courts have described the economic duress doctrine as "equitably based." *Id.* (citation omitted). As a matter of policy, "there is an increasing recognition of the law's role in correcting inequitable or unequal exchanges between parties of disproportionate bargaining power and a greater willingness to not enforce agreements which were entered into under coercive circumstances." *Id.* (citation omitted).

In determining whether the party asserting economic duress had a reasonable alternative available, courts examine "whether a reasonably prudent person would follow the alternative course, or whether a reasonably prudent person might submit." *CrossTalk Prods., Inc. v. Jacobson*, 65 Cal. App. 4th 631, 644 (1998). "*Clearly* this inquiry is a factual one. . . ." *Id.* (emphasis added); *see also Doe 1 v. Morrison & Foerster, LLP*, No. 18-cv-02542-JSC, 2019 WL 11806485, at *4 (N.D. Cal. May 1, 2019) (same). Indeed, "the existence of economic duress raises a number of factual inquiries," *Doe 1*, 2019 WL 11806485, at *4, including whether the individual "faced no reasonable alternative [but] to succumb to the perpetrator's pressure." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1119 (9th Cir. 2018).

The district court determined that Martinez-Gonzalez had no reasonable alternative but to succumb to Elkhorn's pressure to sign the Arbitration Agreements. *Martinez-Gonzalez*, 2019 WL 5556593, at *8. The court's factual inquiry focused on the following facts established during the bench trial:

- The Arbitration Agreements were presented to Martinez-Gonzalez for signature after a twelve-hour bus ride from Mexico to the United States.

- Martinez-Gonzalez was living in housing controlled by Elkhorn.

- Martinez-Gonzalez was provided with no information about the Arbitration Agreements.

- Martinez-Gonzalez was transported to the United States under the auspices of an H-2A visa obtained through Elkhorn and had already begun working for Elkhorn.

- Martinez-Gonzalez reasonably believed that he could not seek work with another employer.

- Martinez-Gonzalez had no other place to live.

- Martinez-Gonzalez had no means of transportation to return to Mexico.

- Martinez-Gonzalez was admonished by Elkhorn supervisors to follow Elkhorn's rules and instructions or risk being sent back to Mexico.

- Elkhorn representatives were aware of and acknowledged "the economic vulnerabilities of their agricultural workers."

*See id.* at *8–*9.

Based on the evidence presented during trial, the district court concluded that no reasonable migrant worker with Martinez-Gonzalez's "significant financial obligations," and "without alternative employment prospects, an alternative

place to live . . . and no practical way to return to Mexico," would have refused to sign the Arbitration Agreements. *Id.* at *9.

The majority opinion articulates no real issue with the findings of fact made by the district court but concludes, nevertheless, that Martinez-Gonzalez was not subjected to economic duress. In the majority's view, this case boils down to whether Elkhorn "committed a wrongful act by asking [Martinez-Gonzalez] to sign the arbitration agreement after [Martinez-Gonzalez] made the journey from Mexico to California." *Majority Opinion*, p. 10. However, that oversimplification of the district court's ruling ignores the detailed factual findings upon which the district court predicated its ruling, including:  1) the fact that Martinez-Gonzalez faced challenging economic circumstances; 2) the fact that Martinez-Gonzalez was dependent on Elkhorn for housing and transportation; 3) the fact that Martinez-Gonzalez reasonably believed that he could only work for Elkhorn on the H-2A visa; 4) the fact that Martinez-Gonzalez was directed to sign the Arbitration Agreements without being allowed to read them and with "no explanation" of them; and 5) the fact that Martinez-Gonzalez was never provided with a copy of the Arbitration Agreements. *Martinez-Gonzalez*, 2019 WL 5556593, at *2–*7.

The majority admits that "the circumstances of the signing of the arbitration agreements were not ideal," but concludes that those circumstances "didn't make a mockery of [the] freedom of contract [or] undermine the proper functioning of our economic system." *Majority Opinion*, p. 11. However, this conclusion by the majority impermissibly conflicts with the detailed factual findings made by the district court. *See Allen*, 283 F.3d at 1078 n.8

(directing "special deference" to factual findings made by the trial court) (quoting *Rich & Whillock*, 157 Cal. App. 3d at 1159). This is not a case of "simple hard bargaining." *Majority Opinion*, p. 8 (quoting *Sheehan v. Atlanta Int'l Ins. Co.*, 812 F.2d 465, 469 (9th Cir. 1987)) (alteration omitted). Rather, this case is a prime example of the "inequitable or unequal exchanges between parties of disproportionate bargaining power" the economic duress doctrine aims to rectify. *Rich v. Whillock*, 157 Cal. App. 3d at 1158. In Mexico, Martinez-Gonzalez earned the equivalent of $150 a week while financially supporting his wife, mother-in-law, mother, and stepfather. He could earn five times more in the United States. Elkhorn knew that "behind every employee, there are three, five, even up to eight people from their families who depend on that worker." *Martinez-Gonzalez*, 2019 WL 5556593, at *9. It is not difficult to contemplate the desperate circumstances that would compel Martinez-Gonzalez to leave his family, travel twelve hours by bus to another country, and work in a field six days a week for nine-plus hours. What is difficult to understand is how the majority can consider *Rich & Whillock*, which involved a contractor "only" obtaining 70% of what was owed, a "classic case of economic duress" while reducing the compelling facts of this case to the signing "of a commonplace agreement." *Majority Opinion*, pp. 11–12.

The majority accuses the dissent of making up California law regarding what constitutes wrongful conduct. *See Majority Opinion*, pp. 12–13. Not so. California law clearly establishes that "[e]conomic duress does not necessarily involve an unlawful act, but may arise from an act that is so coercive as to cause a reasonably prudent person, faced with no reasonable alternative, to agree to an unfavorable contract." *Tarpy v. Cnty. of San Diego*, 110 Cal. App. 4th 267, 277 (2003) (citations and internal quotation marks

omitted). My colleagues in the majority cannot quarrel with that proposition, given their acknowledgment that lawful acts may constitute economic duress if done with "coercive purpose or in bad faith." *Majority Opinion*, p. 10 (internal quotation marks omitted).

Where the majority takes a wrong turn is in proclaiming that the district court "never found that Elkhorn acted with a 'coercive purpose'" in directing Martinez-Gonzalez to sign the arbitration agreements during the mass orientation. *Id.* at 11 n.3. Indeed, the entire thrust of the district court's factual findings was that Elkhorn acted with a coercive purpose: that Elkhorn created a "coercive environment" aimed at robbing Martinez-Gonzalez of the ability to say no to arbitration. *Martinez-Gonzalez*, 2019 WL 5556593, at *11. The majority must ignore these factual findings to conclude otherwise.

The majority even "question[s] whether extracting an arbitration agreement could constitute a 'wrongful threat' under California." *Majority Opinion*, p. 12. This is a strawman argument. Martinez-Gonzalez did not seek to invalidate his employment agreement on the basis that making him sign an arbitration agreement was improper. Rather, he sought to invalidate the arbitration agreement on the basis that he signed it under economic duress and as a result of undue influence. Neither the district court, Martinez-Gonzalez, nor I proposed that signing an arbitration agreement is wrongful in and of itself.

The majority also concludes that Martinez-Gonzalez failed to demonstrate "a lack of reasonable alternatives" to signing the arbitration agreements. *Majority Opinion*, p. 13. Again, the majority takes no real issue with the factual findings made by the district court. Instead, the majority concludes, contrary to those findings, that a reasonable

migrant worker facing the circumstances confronted by
Martinez-Gonzalez would have declined to sign the
Arbitration Agreements. *Id.* at pp. 14–15. However, the
majority's conclusion is belied by the evidence presented
during trial, including the testimony of another migrant
worker who corroborated Martinez-Gonzalez's version of
events. In addition, it was undisputed "that of the thousands
of employees hired, no employee has ever refused to sign the
Arbitration Agreement." *Martinez-Gonzalez*, 2019 WL
5556593, at *6. In the face of this considerable and
persuasive evidence, I cannot fathom how one could
logically conclude that Martinez-Gonzalez had reasonable
alternatives to signing the Arbitration Agreements,
especially given the deference we are required to give the
trial court's findings of fact.

The majority's diminishing of Martinez-Gonzalez's
compelling situation as the need for "a job and . . . money,"
*Majority Opinion*, p. 14, turns a blind eye to the factual
findings regarding Martinez-Gonzalez's dire circumstances,
as well as the realities of migrant workers. Even Elkhorn,
who recognized that "three, five, even up to eight people
from their families . . . depend on [a] worker," *Martinez-
Gonzalez*, 2019 WL 5556593, at *9, was not so dismissive
of the financial weight borne by migrant workers.

The majority maintains that my dissent is "largely based
on Martinez-Gonzalez's socioeconomic background" and
guided by "sympathies" and not the law. *Majority Opinion*,
p. 13. The opposite is true: my paramount guides are the
district court's factual findings, to which we must defer, and
California law, both of which I faithfully apply to the
particular circumstances of this case, including Martinez-
Gonzalez's socioeconomic background. In contrast, as
pointed out, the majority strays from both the district court's

detailed factual findings regarding Martinez-Gonzalez's circumstances and California law.

The majority raises three points in support of its conclusion that Martinez-Gonzalez had reasonable alternatives. *See Majority Opinion*, pp. 14–15. But these three points cannot withstand the force of the district court's factual findings.

> *Majority Point 1:* "No one at Elkhorn told Martinez-Gonzalez that refusing to sign the agreements was a cause for termination."

> ***The Rest of the Story****:* The district court expressly "[did] not credit" testimony from Elkhorn that the agreements were "not mandatory" or that failure to sign would not lead to termination. *Martinez-Gonzalez* 5556593, at \*6. The district court found that despite the lack of an express threat of loss of employment, Martinez-Gonzalez credibly testified regarding his belief that if he refused to sign the Arbitration Agreements, "he would not be given work and would be sent back to Mexico."[2] *Id.* The district court gave the following examples of why Martinez-Gonzalez "had numerous reasons to believe that signing the [Arbitration Agreements] was mandatory": 1) Martinez-Gonzalez was told to hurry through signing the Arbitration

---

[2] This finding is consistent with the amicus' explanation of the H-2A visa program: "[a]n H-2A guestworker generally may only work for the individual employer that obtained the visa for him. When the job ends, or if a worker quits, he must return home or risk deportation."

Agreements; 2) The migrant workers stood in lengthy lines to sign the Arbitration Agreements after working in the fields all day; 3) The migrant workers were tired and hungry; 4) Elkhorn supervisors repeatedly "emphasized the importance of following the rules, while raising the specter of being sent back to Mexico if employees did not work hard"; and 5) The migrant workers "were in the United States on an H-2A visas procured through Elkhorn."    The district court specifically did not credit the testimony of Elkhorn supervisors that the Arbitration Agreements were not mandatory and that no employee would be terminated for refusing to sign them.  *See id.*

Moreover, "no employee was told signing [the Agreements] was optional."  *Id.*  To the contrary, an Elkhorn representative "testified that the Arbitration Agreements were **NOT** voluntary," that the "documents were **REQUIRED** for the employees to begin working," and that "he would look for any worker [who] did not sign all the documents."  Another Elkhorn representative testified that the Arbitration Agreement was presented as a document "you **ARE** going to sign."  *Id.* (bolding added).

The majority's suggestion that "facts don't matter" to me or to the district court, *Majority Opinion*, p. 15, is nothing short of

gaslighting.[3]  The district court heard the testimony, weighed the conflicting evidence, and issued detailed factual findings, including credibility assessments.  We may not disturb those detailed factual findings unless they are clearly erroneous.  *See Bontemps*, 977 F.3d at 917.  Because the district court's factual findings are anchored in the record developed during trial, the majority is actually the side ignoring the facts.

*Majority Point 2*:  Martinez-Gonzalez did not ask if the arbitration agreements were mandatory, and he could have asked to review the documents.

***The Rest of the Story***:  The district court found, after hearing testimony, that Martinez-Gonzalez had "no real opportunity to review the new-hire documents" or "read the Arbitration Agreement[s]."  *Martinez-Gonzalez*, 2019 WL 5556593, at *4, *7.  Rather, Martinez-Gonzalez was rushed through the process and presented with a stack of documents to sign, none of which was even identified as an arbitration agreement. *See id.* at *6–*7.  The supervisors

---

[3] The term "[g]aslighting is . . . used informally to describe someone who persistently puts forth [a] false narrative" in an effort to cause "another person to doubt [her] own perceptions. . . ." https:en.m.wikipedia.org.  9/19/2021.  I do not question my colleagues respect for me and I respect them equally.  But the words written by the majority say what they say.

flipped through the stack of documents and directed the migrant workers where to sign, with no opportunity to view the documents.[4] *See id.* Martinez-Gonzalez and the other migrant workers were also tired and hungry from having worked a full day in the fields. *See id.*

The majority is correct that Elkhorn representatives testified that workers "were invited to ask questions about the documents." *Majority Opinion*, p. 15 n.4. But the district court did not credit this testimony. Rather, the district court noted that one Elkhorn representative testified that no workers had ever asked him any questions. *See Martinez-Gonzalez*, 2019 WL 5556593, at *6. Moreover, Martinez-Gonzalez's co-worker testified that when he did ask questions about the documents he was signing, he was told that they concerned "insurance." *Id.* The district court credited the testimony that Martinez-Gonzalez was not allowed to read the Arbitration Agreements, they were not explained to him, and he was never provided copies of the agreements. *See id.* at *5–*6. In fact, one Elkhorn representative testified that even if a worker inquired, "he would not have been

---

[4] Moreover, it strains credulity that the Arbitration Agreements were voluntary when, as amicus further noted, the lack of limits for H-2A visas create an "unlimited supply of guestworkers" and "[i]f one worker decides conditions are too dangerous or pay is too low, another H-2A worker can quickly take his place."

able to explain the rights [migrant] workers were waiving by signing the Arbitration Agreement[s]." *Id.* at *6. Based on those facts and others, the district court concluded that Elkhorn's position that it never told workers they could not review the documents "did not negate the coercive environment created by the circumstances and the reasonably perceived risks facing [Martinez-Gonzalez] and his co-workers." *Id.* at *11. In other words, Martinez-Gonzalez had no meaningful opportunity to ask questions about the Arbitration Agreements.

*Majority Point 3*:     "[T]he arbitration agreements expressly allowed Martinez-Gonzalez to revoke the contract within ten days."

***The Rest of the Story***:  According to the district court's factual findings, there was no way that Martinez-Gonzalez would have known about the revocation provision in the Arbitration Agreements. Martinez-Gonzalez was not allowed to read the Arbitration Agreements, they were not explained to him, and he was never provided copies of the agreements. *See id.* at *5–*6. Because the documents were gathered up by the supervisors immediately after signing, there was no opportunity to request a copy to review later, particularly as the testimony reflected that the supervisors rushed the workers through the process, with no opportunity for questions. *See id.*

California appellate courts and federal district courts applying California law uniformly agree, without controversy, that whether reasonable alternatives exist, and whether duress is present in general, are factual questions. *See CrossTalk*, 65 Cal. App. 4th at 644 ("Clearly, this inquiry is a factual one."); *accord Est. Of Bennett*, 163 Cal. App. 4th 1303, 1310 (2008); *see also Doe*, 2019 WL 11806485, at *4; *Synnex Corp. v. Wattles*, No. 11-cv-01496-YGR, 2012 WL 5524953, at *5 (N.D. Cal. Nov. 14, 2012) ("Whether a party acted under duress is normally a question of fact . . .") (citation omitted); *Porsandeh v. Prudential Prop. & Cas. Ins. Co.*, No. CV-02-5354-EFS(SHX), 2004 WL 5642440, at *6 (C.D. Cal. Apr. 30, 2004) ("Economic duress is a question for the jury. . . .") (citation omitted).

At bottom, the facts in this case were disputed. The district court conducted a trial and made factual findings, to which we must defer. *See Allen*, 283 F.3d at 1078 n.8. The district court's finding of economic duress is amply supported by the evidence developed during trial. The majority's contrary finding is not.

The district court's conclusion that Martinez-Gonzalez was subjected to undue influence stands on even firmer footing. Under California law, "undue influence" is defined as "persuasion which tends to be coercive in nature, persuasion which overcomes the will without convincing the judgment." *Odorizzi v. Bloomfield Sch. Dist.*, 246 Cal. App. 2d 123, 130 (1966) (citation omitted). "The hallmark of [coercive] persuasion is high pressure. . . . *Id.* (citation omitted). *See also* Cal. Civ. Code § 1575 ("Undue influence consists . . . [i]n taking a grossly oppressive and unfair advantage of another's necessities or distress.").

Undue influence exists when the "weakness on one side, or strength on the other, or a combination of the two" results

in the overbearing of the will of the weaker side. *Odorizzi*, 246 Cal. App. 2d at 132.

California courts examine the following factors to determine the existence of excessive pressure resulting in the overbearing of one's will:

> Factor 1 - discussion of the transaction at an unusual or inappropriate time
>
> Factor 2 - consummation of the transaction in an unusual place
>
> Factor 3 - insistent demand that the business be finished at once
>
> Factor 4 - extreme emphasis on untoward consequences of delay
>
> Factor 5 - the use of multiple persuaders by the dominant side against a   single servient party
>
> Factor 6 - absence of third-party advisers to the servient party
>
> Factor 7 - statements that there is no time to consult financial advisers or attorneys.

*Id.* at 133. "If a number of these elements are simultaneously present; the persuasion may be characterized as excessive." *Id.*

A comparison of the district court's findings to the applicable factors is informative.

44    MARTINEZ-GONZALEZ V. ELKHORN PACKING

| Factors | District Court Findings |
|---|---|
| Unusual or inappropriate time | At the end of the workday after toiling in the fields |
| Unusual place | Parking lot of the hotel |
| Insistence on speedy completion | Repeatedly admonished to hurry |
| Consequences of delay | No specific factual finding |
| Multiple persuaders | Multiple seated Elkhorn supervisors present while migrant workers stood in line and waited for directions |
| Absence of third-party advisers | No opportunity to consult an attorney |
| Statement of lack of time to consult adviser | No specific factual finding |

The district court made specific factual findings directly corresponding to five of the seven *Odorizzi* factors. Therefore, the persuasive force applied by Elkhorn to obtain Martinez-Gonzalez's signature on the Arbitration Agreements was properly characterized by the district court as "excessive." *Id.*

The majority seeks to blunt the force of the district court's factual findings that mirror five of the *Odorizzi* factors by referencing the specific facts of cases discussed in *Odorizzi*. *See Majority Opinion*, p. 22. However, the court in *Odorizzi* foreclosed the majority's argument by clarifying in advance that the cases discussed "are illustrative" and in

no way reflect the universe of circumstances that constitute undue influence. *Odorizzi*, 246 Cal. App. 2d at 133. The majority attempts to dodge that clarification by hedging in a footnote that they "do not suggest that these examples represent 'the universe of circumstances' constituting undue influence." *Majority Opinion*, p. 22 n.9. But the majority does indeed make such a suggestion by ignoring the district court's factual findings on the *Odorizzi* factors.

Overall, my colleagues in the majority pay lip service to the deference we owe to the district court's factual findings, while simultaneously making their own factual findings based on their own weighing of the evidence. *See Majority Opinion*, pp. 19–25. The majority admits that the Arbitration Agreements were signed in an "atypical" place, but attempt to normalize that practice because Elkhorn grow[s] vegetables in remote farmlands." *Id.* at 22. Any way you slice it, as the district court found, a hotel parking lot "is an unusual place to execute legally binding documents." *Martinez-Gonzalez*, 2019 WL 5556593, at *10. Moreover, the fact that workers "had no place to sit down, no desks upon which they could review the documents prior to signing them, and no opportunity or privacy that would permit them to speak with an attorney or family member outside of the presence of their employer or co-workers," added to the coercive effect of the unusual setting. *Id.* The majority also elides the fact that workers signed the Arbitration Agreements after having "worked a full day in the fields" and while "tired, hungry, [and] eager to get cleaned up before going to sleep." *Id.*

The majority concedes that Elkhorn hurried workers to sign the new-hire documents, but mischaracterizes that fact as an accommodation to other workers waiting in line to sign rather than "some bad-faith pressure tactic." *Majority*

*Opinion*, p. 23. In doing so, the majority blatantly ignores the district court's finding that Elkhorn manufactured the coercive atmosphere by urging tired and hungry workers to execute an unexplained stack of documents at the end of a long workday in a hotel parking lot. The majority's "accommodation" euphemism flies in the face of district court's finding, after assessing conflicting evidence and making credibility determinations, that Elkhorn created an oppressive and coercive atmosphere.

In addition, the majority relies on the fact that Elkhorn did not expressly forbid Martinez-Gonzalez from asking for time to review the documents or to consult an attorney. *See Majority Opinion*, p. 23. But as discussed, the district court found that Elkhorn created an atmosphere that precluded and discouraged the ability to review documents, ask questions, and consult advisors. Of course, Elkhorn did not expressly inform its workers: "sign these documents without reading them or consulting a lawyer or suffer termination." If employers openly displayed such coercive tactics, there would be no need to apply the multi-factor test developed by the courts to determine coercion.

Finally, contrary to the majority's characterization, neither I nor the district court engaged in a "simple box-checking exercise." *Majority Opinion*, p. 21 n.8. Rather, the district court applied the *Odorizzi* factors and I give appropriate deference to the district court's application of those factors to the evidence presented at trial. In contrast, my colleagues in the majority erased all the boxes, discarded the district court's factual findings, and wrote their own version of the facts based on a manufactured "totality of the circumstances review." *Id.* at 24.

The majority cites *Myers v. United States*, 652 F.3d 1021 (9th Cir. 2011), to support its disregard for the trial court's

factual findings.  *See Majority Opinion*, p. 17.  However, the panel in *Myers* concluded that there was clear error because the factual findings were "without support in inferences that may be drawn from the facts in the record." *Myers*, 652 F.3d at 1036.  The same cannot be said for the findings made by the district court in this case, each of which was linked to specific evidence developed during trial.

Under the proper standard of review, far from being clearly erroneous, the district court's determination that Martinez-Gonzalez was subjected to economic duress and undue influence was firmly tethered to its review of the witness testimony and evidence presented during trial.  As we have colorfully observed, "[t]o be clearly erroneous, a decision must strike us as wrong with the force of a five-week old, unrefrigerated dead fish." *Ocean Garden, Inc. v. Marktrade Co., Inc.*, 953 F.2d 500, 502 (9th Cir. 1991) (citation and alterations omitted).

The district court decision in this case comes nowhere close to meeting this standard.  The "key facts" the majority contends the district court ignored, *Majority Opinion*, p. 17, were, in fact, considered by the district court.  The district court simply reached an opposite conclusion, to which we must "special[ly] defer[]." *Allen*, 283 F.3d at 1078 n.8.  In sum, the district court's finding of economic duress is amply supported by the evidence developed during the trial.  The majority's contrary finding is not.

The presence of either economic duress or undue influence was sufficient to rescind the Arbitration Agreements.  *See Nmsbpcsldhb v. Cnty. of Fresno*, 152 Cal. App. 4th 954, 959 (2007) (explaining that under California law, a contract may be rescinded under various grounds, including undue influence and duress) (citing Cal. Civ. Code § 1689).  As the majority completely disregards the district

court's comprehensive factual findings following trial and the clear error standard of review in concluding otherwise, I respectfully dissent.