UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARIO MARTINEZ-GONZALEZ, | Case No. 18-cv-05226-EMC |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' POST-REMAND MOTION TO COMPEL ARBITRATION** |
| v. | |
| ELKHORN PACKING CO., LLC, et al., | Docket Nos. 24, 121 |
| Defendants. | |

Plaintiff Dario Martinez-Gonzalez sued Defendants Elkhorn Packing Co. ("Elkhorn") and D'Arrigo Bros. Co. of California ("D'Arrigo," and together with Elkhorn, "Defendants") for alleged labor violations. Defendants previously moved to compel arbitration. Docket No. 24 ("MTC"). After a bench trial, the Court denied Defendants' motion, concluding that the relevant arbitration agreements were invalid and unenforceable under the doctrines of economic duress and undue influence. Docket No. 67 ("*Elkhorn I*"). Defendants appealed. The Ninth Circuit reversed the Court's unenforceability conclusions and remanded to this Court "to determine whether [Plaintiff's] claims fall within the scope of the arbitration agreement." *See Martinez-Gonzalez v. Elkhorn Packing Co. LLC*, 25 F.4th 613, 629 (9th Cir. 2022) ("*Elkhorn II*").

Now pending is Defendants' post-remand, supplemental motion to compel arbitration. *See* MTC; Docket No. 121 ("Suppl. MTC"). For the following reasons, the Court **GRANTS** Defendants' motion to compel arbitration.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

A.     Factual Background

The operative complaint alleges the following. Mr. Martinez-Gonzalez is an agricultural

worker from Mexico who was recruited in Mexico by Elkhorn to work in fields operated by D'Arrigo in California and Arizona.  Docket No. 13 ("FAC") ¶¶ 1–2, 17.  He was employed as a seasonal laborer by Defendants under the H-2A visa program during the 2016, 2016–17, and 2017 lettuce harvesting seasons, under the terms of three separate job orders.  *Id.* ¶¶ 26, 58, 76.  Under the terms of the job orders and applicable federal regulations, Elkhorn was required to provide three meals a day to workers residing in employer-provided housing in which full kitchen facilities were not available for workers to prepare their own meals, as well as exercise time.  *Id.* ¶¶ 21–23.

Mr. Martinez-Gonzalez alleges that during each of his three periods of employment, "Defendants violated federal and California law by failing to pay Plaintiff and other aggrieved employees for all hours worked, failing to pay required minimum wages and premium overtime pay, failing to provide meal and rest periods or compensation for missed meal and rest periods, and failing to pay waiting time penalties."  *Id.* ¶ 1.  "Defendants also breached the duty of care they owed to Plaintiff by providing meals to Plaintiff and . . . other workers working under the same job order(s) that were contaminated or spoiled and were not safe to eat."  *Id.*  In addition, on at least five occasions during the 2017 season, agents of Elkhorn entered Mr. Martinez-Gonzalez's Elkhorn-provided hotel room "without prior notice or permission," including once in June 2017 when an agent named "Lance yelled, physically intimidated Plaintiff by standing close to his face and threatened Plaintiff . . . with job suspension if Plaintiff complained about the unauthorized entry into Plaintiff's hotel room."  *Id.* ¶¶ 104–05.  Mr. Martinez-Gonzalez brings fourteen causes of action, including violations of the Fair Labor Standards Act, various provisions of the California Labor Code, the California Unfair Competition Law, the Private Attorneys General Act ("PAGA"), as well as breach of contract, negligence, and tortious intrusion upon seclusion.  *Id.* ¶¶ 106–222.

B.   The Arbitration Agreements

Defendants attach to their motion copies of identical Spanish-language arbitration agreements between Elkhorn and Mr. Martinez-Gonzalez that were signed on April 11, 2016, and

March 28, 2017.[1]  *See* Docket No. 24-1, Exhs. 1, 2.  Also attached is an English version of the agreements.  *See id.*, Exh. 3 ("Agreements").  In relevant part, the agreements provide:

> The Company [Elkhorn] and I [Mr. Martinez-Gonzalez] agree that all claims, disputes and controversies arising out of, relating to or in any way associated with my employment by the Company or the termination of that employment shall be submitted to final and binding arbitration pursuant to the terms of this agreement.

Agreements ¶ I.  They further state:

> To the extent permitted by law, the Company and I agree to waive any right to file any class or representative claims addressing wages or other terms or conditions of employment in any forum.

*Id.* ¶ III.  Moreover:

> This Agreement applies to any dispute involving the Company as well as any of its subsidiary or affiliated companies, successors and assigns, employees, officers and agents.

*Id.* ¶ XI.  Finally, they read:

> I HAVE READ THE FOREGOING ARBITRATION AGREEMENT AND UNDERSTAND ITS TERMS INCLUDING ITS WAIVER OF MY RIGHT TO A TRIAL IN A COURT OF LAW.  I ACKNOWLEDGE THAT I HAVE BEEN GIVEN TIME TO REVIEW THIS AGREEMENT, TO GO OVER IT WITH AN ATTORNEY OF MY CHOICE AND THAT I HAVE THE RIGHT TO WITHDRAW FROM THIS AGREEMENT BY WRITTEN NOTICE TO THE COMPANY WITHIN 7 DAYS OF MY SIGNATURE.

Agreements ¶ XIV.

C.    Procedural Background

      1.    Prior District Court Proceedings

      Mr. Martinez-Gonzalez's original complaint was filed in the Superior Court of California on July 26, 2018.  *See* Docket No. 1–2, Exh. A.  Defendants removed the case to this Court on August 26, 2018, on the basis of diversity jurisdiction.  *See* Docket No. 1.  Mr. Martinez-Gonzalez then filed the operative first amended complaint on September 28, 2018.  Docket No. 13.  Defendants moved to compel arbitration on December 18, 2018.  *See* MTC.  Plaintiff opposed, arguing that he did not enter into an agreement to arbitrate future disputes with Elkhorn because he

---

[1] The April 11, 2016 arbitration agreement appears to have covered both the 2016 and 2016–17 seasons.

3

was under economic duress and subject to undue influence when signing the arbitration agreements. *See* Docket No. 28 at 3–8.

The Court deferred ruling on Defendants' motion to compel and set a trial regarding Plaintiff's affirmative defenses to the validity and enforceability of the arbitration agreements. Docket No. 38. On July 23, 2019, Plaintiff filed a Pretrial Conference Statement in which he indicated his intent to raise affirmative defenses of undue influence and economic duress at the trial. Docket No. 48. That same day, Plaintiff filed a trial brief developing his arguments and explaining the evidence in support of these two affirmative defenses. Docket No. 49.

On August 8, 2019, the parties filed a Joint Pretrial Conference Statement with the Court, in which Plaintiff set forth economic duress and undue influence as the only affirmative defenses he intended to raise at the trial. Docket No. 53. On September 16, 2019, the Court held a status conference with the parties to discuss the scope and plan for the upcoming trial; the parties discussed Plaintiff's economic duress and undue influence affirmative defenses, and there was no indication that Plaintiff sought to raise additional arguments with regards to the validity or enforceability of the arbitration agreements. *See* Docket No. 56.

The bench trial commenced on October 15, 2019. Plaintiff's counsel raised for the first time that Plaintiff sought to add an additional affirmative defense for "fraud in the factum" to their Opposition to Defendants Motion to Compel Arbitration "[b]ased on the evidence that has come to light through the depositions and today's testimony." *See* Docket No. 121-2 ("Silva Decl."), Exh. 6 ("Trial Transcript") at 178:6–14. To support this new affirmative defense, Plaintiff's counsel stated, "Plaintiff and the other workers were misled about the nature of what they were signing." *Id*. at 178:16–17. In response to the Court inquiry as to whether Plaintiff was seeking to amend Plaintiff's Opposition to Plaintiff's Motion to Compel Arbitration, Plaintiff's counsel responded and engaged in the following discussion with the Court as follows:

> Our Opposition because, again, this is based on evidence that we were not aware of at the time we wrote the Opposition.
>
> THE COURT: Well, you weren't aware of your clients' potential testimony about what they were told?
>
> Ms. Gilbride: We had had conversation with him at that time, yes,

> and that his declaration, which was submitted in conjunction with the Opposition, reflect what he had told us at that point.
>
> But in the course of the discovery, having his deposition taken, having more extended conversation, additional facts have come to light. Specifically, these references to seguro and that people were told the documents involved social security.
>
> That's a fact that - - I can't personally say when it was first brought to our attention because there are multiple lawyers, but it certainly didn't come to my attention, and the significance didn't come to my attention until the course of preparing for this trial.

*Id*. at 179:2–20.  After Defendants noted their objections, the Court ruled:

> All right. I'm not going to allow any additional defense at this point, especially this is information that could have been obtained with reasonable diligence from -- this is not like something disclosed from the Defendants in a document that was hidden and then produced at the eleventh hour and therefore contains some new defense.
>
> This defense is based on the client, your client's own testimony. And at this juncture, we've set this mini trial to hear two specific defenses and the evidence has been tailored to address those two specific defenses and it would be prejudicial to allow this late breaking defense. So I'm not going to allow it.

*Id*. at 181:11–23.  On October 16, 2019, Plaintiff's counsel again requested to raise the fraud in the factum affirmative defense.  *Id.* at 332:9–14.  The Court responded:

> Well, I've ruled that that is too late to raise that as a legal defense.
>
> Now, whether that might—the question of misrepresentation or mischaracterization might inform one of the other already existing defenses. That's something that I haven't been asked to look at.
>
> But I'm not going to allow a new affirmative, brand new affirmative defense this late in the game. We're going to—the Court is going to rule on the defenses that have been already raised.

*Id*. at 332:15–24.  After the hearing was closed, the Court made findings of fact and conclusion of law in favor of Plaintiff as to his affirmative defenses of undue influence and economic distress and, therefore, denied Defendants' Motion to Compel Arbitration.  *See Elkhorn I.*

### 2.   Ninth Circuit Proceedings

Defendants timely appealed the Court's denial of their motion to compel arbitration to the Ninth Circuit.  *See* Docket No. 68.  On February 14, 2022, the Ninth Circuit issued its opinion reversing this Court's conclusions that Plaintiff signed the arbitration agreements under economic

United States District Court
Northern District of California

1  duress and undue influence.  *Elkhorn II*, 25 F.4th at 629.

2        The Ninth Circuit explained that "the economic duress doctrine is employed 'reluctant[ly]'

3  and 'only in limited circumstances'" and found, "[h]ere, there is no reason to invoke this 'last

4  resort' given the lack of wrongful actions, the existence of reasonable alternatives, and Martinez-

5  Gonzalez's continued ability to vindicate his interests in arbitration."  *Id.* at 625.  "As a result, [the

6  Ninth Circuit] disagree[d] with the district court that Martinez-Gonzalez established economic

7  duress."  *Id.*  The Ninth Circuit further determined that "neither undue susceptibility nor excessive

8  pressure appears here to any significant degree, it is implausible and unsupported by the record to

9  find undue influence here."  *Id.* at 628.  The court, therefore, concluded, "Martinez-Gonzalez has

10  not shown that he signed the arbitration agreements under economic duress or undue influence."

11  *Id.* at 629.  The Ninth Circuit "therefore reverse[d] and remand[ed] to the district court to

12  determine whether Martinez-Gonzalez's claims fall within the scope of the arbitration agreement."

13  *Id.*

14        On February 22, 2022, the Ninth Circuit issued its mandate.  Docket No. 116.  Thereafter,

15  this Court held a status conference with the parties and entered a scheduling order for the parties to

16  address the outstanding issues pertaining to the Ninth Circuit's remand order.  Docket No. 120.

17  Accordingly, the parties filed responsive briefing.  *See* Suppl. MTC; Docket No. 122 ("Suppl.

18  Opp."); Docket No. 124 ("Suppl. Reply").  Now pending is Defendants' post-remand,

19  supplemental motion to compel arbitration.

20                 **II.**      **LEGAL STANDARD**

21  A.    Motion to Compel Arbitration Pursuant to the Federal Arbitration Act

22        The Federal Arbitration Act ("FAA") reflects "both a 'liberal federal policy favoring

23  arbitration' and the 'fundamental principle that arbitration is a matter of contract.'"  *AT&T*

24  *Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  It allows a "party aggrieved by the

25  alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration"

26  to bring a petition in district court "for an order directing that such arbitration proceed in the

27  manner provided for in such agreement."  9 U.S.C. § 4.  In adjudicating a petition under 9 U.S.C.

28  § 4, a court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and,

United States District Court
Northern District of California

if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).  If both questions are answered in the affirmative, the court must enforce the arbitration agreement.  *Id.*

### III.     DISCUSSION

In light of the Ninth Circuit's decision and remand order in *Elkhorn II*, Defendants renew their motion to compel all claims to arbitration.  Plaintiff opposes Defendants' post-remand, supplemental motion to compel arbitration on several grounds.  First, Plaintiff raises a threshold argument that the FAA does not apply.  Second, Plaintiff asserts fraud as additional affirmative defense to the validity of the arbitration agreements at issue.  Third, if the arbitration agreements are valid and enforceable, Plaintiff argues that they do not cover Defendant D'Arrigo.  Finally, fourth, Plaintiff argues that several of his claims are not arbitrable.

A.     Applicability of the Federal Arbitration Act

As the Court previously explained when considering the parties initial briefing with regards to Defendants' motion to compel, "Neither party disputes that the Federal Arbitration Act ('FAA') governs this case."  *See* Docket No. 38 ("Interim Order") at 6.  However, Plaintiff now reverses course and argues, for the first time in his supplemental opposition brief, that the arbitration agreements at issue are not subject to the FAA.  *See* Suppl. Opp. at 9–12.  Plaintiff cites the language of the FAA which applies, in relevant part, to agreements which are (1) "a written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract," or (2) "an agreement in writing to submit to arbitration an existing controversy arising out of such contract."  *See* 9 U.S.C. § 2.  Plaintiff argues that since the arbitration agreements were signed at the *beginning* of each of the 2016 and 2017 growing seasons, the FAA only applies if the first prong is satisfied.  Suppl. Opp. at 12.  However, Plaintiff contends that the arbitration agreements were *not* embedded in a contract evidencing a transaction involving commerce, and thus the FAA does not apply.

Specifically, Plaintiff contends that Elkhorn should have included—but did not include—the arbitration agreements in the job orders pertaining to each of the lettuce seasons for which Elkhorn obtained authorization from the Department of Labor to hire H-2A workers in 2016 and

2017.  Suppl. Opp. at 11.  Plaintiff argues that because Elkhorn neither disclosed the arbitration agreements to the Department of Labor nor to Plaintiff in the H-2A job orders, the arbitration agreements were stand-alone agreements which did not relate to a "a contract evidencing a transaction involving commerce."  *Id.* at 11–12 ("Elkhorn's 2016 and 2017 arbitration agreements [are] outside the scope of the FAA because they purport to be forward-looking agreements governing future employment related disputes but are no embedded in a contract evidencing a commercial transaction as Section 2 require.").  In further support of this argument, Plaintiff points to 20 C.F.R. § 655.103 implementing the H-2A program and requiring that job orders submitted for approval to the Department of Labor must contain all material terms and conditions of employment.  *Id.*  Finally, as to the timing of this argument, Plaintiff contends that the applicability of the FAA is a threshold jurisdictional question which implicates the Court's subject matter jurisdiction over Defendants' motion to compel and thus, can never be waived.  Suppl. Opp. at 12 (citing *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019) ("[T]o invoke its statutory powers under §§ 3 and 4 to stay litigation and compel arbitration according to a contract's terms, a court must first know whether the contract itself falls within or beyond the boundaries of §§ 1 and 2.")).

Although the Court disagrees with Plaintiff's characterization of the applicability of the FAA as a question implicating the Court's subject matter jurisdiction over this case, the Court agrees with Plaintiff's procedural argument that it is necessary for the Court to ensure that the FAA applies to the arbitration agreements at question before the Court can consider whether to stay the litigation and compel arbitration under the FAA.  *See id.* at 537–38 ("The parties' private agreement may be crystal clear and require arbitration of every question under the sun, but that does not necessarily mean the Act authorizes a court to stay litigation and send the parties to an arbitral forum.").

Plaintiff cites no authority for the proposition that in order for an arbitration agreement to "evidenc[e] a transaction involving commerce" under the FAA, 9 U.S.C. § 2, it must be physically "embedded in [a] commercial contract[]."  Suppl. Opp. at 10.  Rather, Plaintiff presents a formalistic argument that the arbitration agreements at issue here are not covered by the FAA

because they were not part of the *same document* as the job offer made to Plaintiff and, thus, are standalone side agreements insufficient to "evidenc[e] a transaction involving commerce." *Id.* at 10–11.

But Plaintiff does not dispute that the arbitration agreements specifically apply to "all claims, disputes and controversies arising out of, relating to or in any way associated with [Plaintiff's] *employment* with [Elkhorn] or the termination of that employment." Agreements ¶ I (emphasis added); *id.* ¶ XII ("I agree that this Agreement shall be in full force and effect during the entire period of my employment with the Company."). So long as the arbitration agreement is contained in "a contract evidencing a transaction [here employment] in commerce," the FAA applies. If the arbitration agreement is a part of the valid employment agreement, as the Ninth Circuit held here, it is part of a "contract evidencing a transaction." Indeed, in light of the fact that the arbitration agreements expressly refer to Plaintiff's employment with Elkhorn, Plaintiff does not explain why the fact the arbitration agreements are separate documents from Plaintiff's employment contract has the effect of divorcing the arbitration agreements from Plaintiff's employment with Elkhorn. *Cf. Ashbey v. Archstone Prop. Mgmt., Inc.*, 612 F. App'x 430, 431 (9th Cir. 2015) ("California law permits parties to form contracts by incorporating other documents by reference; and 'an employee may agree to arbitrate claims against his or her employer by signing an acknowledgment form that incorporates the employer's employee handbook and the arbitration policy it contains.'") (citing *Avery v. Integrated Healthcare Holdings, Inc.*, 218 Cal.App.4th 50, 159 Cal.Rptr.3d 444, 457 (2013)). After all, the disputes subject to arbitration relate to Plaintiff's *employment* with Elkhorn. Defendants are engaged in interstate commerce; accordingly, Plaintiffs' employment with Defendants—to which the arbitration agreements apply—affects commerce within the meaning of the FAA. *See* MTC at 10–11.

Thus, the Court concludes that the arbitration agreements sufficiently evidence a transaction involving commerce under 9 U.S.C. § 2, and, therefore, the FAA applies.

B.    <u>Plaintiff's Fraud Defense</u>

As a procedural matter, Plaintiff argues he is entitled to raise fraud as an additional

affirmative defense to validity and enforceability of the arbitration agreements.  Plaintiff contends that he "properly preserved the fraud defense during the bench trial in this case" and that the Court may decide the fraud defense issue based on the findings already in the record.  Suppl. Opp. at 12–13.  Plaintiff further argues that the Court has broad discretion as to which arguments it will consider because the Ninth Circuit reversed the Court's prior order and "remanded for further proceedings."  *Id.* (citing *Publishers Paper Co. v. Ass'n of W. Pulp & Paper Workers*, Civil No. 84-830-FR, 1989 WL 87992, at *1 (D. Or. July 23, 1989)).

The Court finds Plaintiff's procedural arguments unpersuasive.  First, as the procedural history demonstrates, Plaintiff did not "properly preserve[]" his fraud defense.  "An affirmative defense, once forfeited, is excluded from the case."  *Wood v. Milyard*, 566 U.S. 463, 470 (2012) (cleaned up); *see also id.* at n.4 ("[A] forfeited plea is one that a party has merely failed to preserve."); *United States v. Olano*, 507 U.S. 725, 733 (1993) ("[F]orfeiture is the failure to make the timely assertion of a right . . .").  Plaintiff opposed Defendants' initial motion to compel arbitration and raised two affirmative defenses but did not raise a fraud defense.  Docket No. 28.  The Court then scheduled a bench trial to address issues of fact regarding Plaintiff's affirmative defenses.  Docket No. 38.  In the following months, Plaintiff filed a pretrial statement, trial brief, joint pretrial statement, and pretrial status reports with the Court but did not indicate he would raise a fraud defense in any of those filings.  *See, e.g.*, Docket Nos. 48, 49, 53, 56.

It was only at the commencement of the bench trial that Plaintiff raised his interest in asserting an affirmative defense of fraud for the first time.  The Court engaged in a colloquy with Plaintiff's counsel to understand the basis for Plaintiff's late attempt to raise the defense and concluded that Plaintiff had not shown good cause to pursue the defense, that the "information [relevant to the defense] could have been obtained with reasonable diligence," that the information relevant to the defense was *not "*something disclosed from the Defendants in a document that was hidden and then produced at the eleventh hour and therefore contains some new defense," and that "it would be prejudicial to allow this late breaking defense."  Trial Transcript at 181:11–23.  The Court renewed its ruling rejecting Plaintiff's attempt to raise the defense the next day.  *Id.* at 332:15–24 ("I'm not going to allow a new affirmative, brand new affirmative defense this late in

the game.").

Plaintiff has not explained why it would be appropriate to raise the fraud defense now, at this juncture, even *further* into the litigation of this issue, where the Ninth Circuit has already considered and ruled on Plaintiff's affirmative defense theories.  And Plaintiff is incorrect in asserting that the evidentiary record is sufficient to resolve Plaintiff's fraud defense as Defendants had no notice or opportunity to examine any witnesses or otherwise develop evidence with regards to Plaintiff's allegations of fraud.

Moreover, Plaintiff misconstrues the scope of the Ninth Circuit's remand order.  Contrary to Plaintiff's contention, the Ninth Circuit did not generically remand to this Court with a general instruction to conduct proceedings consistent with the Ninth Circuit's order.  Instead, the Ninth Circuit remanded to this Court to specifically to "determine whether Martinez-Gonzalez's claims fall within the scope of the arbitration agreement."  *Elkhorn II*, 25 F.4th at 629.  Thus, the Ninth Circuit decided the validity of the arbitration agreements at issue here, and consideration of further affirmative defenses to their validity does not appear to be within the scope of the Ninth Circuit's remand order.  *See Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012) ("A district court is limited by [the Ninth Circuit's] remand when the scope of the remand is clear.  Violation of the rule of mandate is a jurisdictional error.") (citation omitted).

Thus, the Court concludes that Plaintiff's fraud affirmative defense to the validity of the arbitration agreements is untimely and that the Court lacks jurisdiction to address it now in light of the scope of the Ninth Circuit's remand order.

C.    Applicability of Arbitration Agreements to D'Arrigo

In adjudicating a petition under 9 U.S.C. § 4, a court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  *Chiron*, 207 F.3d at 1130.  Having determined that the FAA applies here and the arbitration agreements are valid, the Court now turns to "whether the agreement[s] encompass[] the dispute[s] at issue," *id.*, or, put differently, the scope of the agreements.  The first issue with regards to the scope of the agreements is whether the agreements apply to Defendant D'Arrigo.  It is undisputed and the record demonstrates that the arbitration

agreements expressly apply to Plaintiff and Defendant Elkhorn.  *See* Agreements ¶¶ I, III.
Defendants argue that Defendant D'Arrigo may also invoke the arbitration agreement as a non-
signatory.

"The United States Supreme Court has held that a litigant who is not a party to an
arbitration agreement may invoke arbitration under the FAA if the relevant state contract law
allows the litigant to enforce the agreement."  *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122,
1128 (9th Cir. 2013) (citing *Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 632 (2009)).  Under
California law, "[t]here are circumstances in which nonsignatories to an agreement containing an
arbitration clause can be compelled to arbitrate under that agreement."  *Suh v. Superior Court* 181
Cal. App. 4th 1504, 1513 (2010).  "As one authority has stated, there are six theories by which a
nonsignatory may be bound to arbitrate: "(a) incorporation by reference; (b) assumption; (c)
agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary."  *Id.* (citation
omitted).  Here, D'Arrigo advances arguments under theories of equitable estoppel, agency, and
third-party beneficiary.

     1.    <u>Equitable Estoppel</u>

Under California law, equitable estoppel applies to allow a nonsignatory to enforce an
arbitration agreement "in two circumstances: (1) when a signatory must rely on the terms of the
written agreement in asserting its claims against the nonsignatory or the claims are 'intimately
founded in and intertwined with' the underlying contract, and (2) when the signatory alleges
substantially interdependent and concerted misconduct by the nonsignatory and another signatory
and 'the allegations of interdependent misconduct [are] founded in or intimately connected with
the obligations of the underlying agreement.'"  *Kramer*, 705 F.3d at 1128–29 (quoting *Goldman v.
KPMG LLP*, 173 Cal. App. 4th 201, 219, 221(2009)).  "The doctrine applies where the claims are
'based on the same facts and are inherently inseparable' from the arbitrable claims against
signatory defendants."  *Garcia v. Pexco, LLC*, 11 Cal. App. 5th 782, 786 (2017) (citation omitted).

Defendants argue that Plaintiff's claims against D'Arrigo and Elkhorn are based on the
same facts and are inherently inseparable, such that equitable estoppel applies and permits
D'Arrigo to enforce the arbitration agreements as a nonsignatory.  MTC at 11–15.  In support of

United States District Court
Northern District of California

this argument, Defendants cite the following allegations in the operative complaint and sworn deposition testimony:

- Plaintiff alleges he was "employed by Defendants ELKHORN PACKING and D'ARRIGO BROS. as an H-2A seasonal agricultural laborer," "[d]uring his employment, Defendants violated federal and California law by failing to pay Plaintiff and other aggrieved employees for all hours worked," and "Defendants also breached the duty of care they owed to Plaintiff by providing meals to Plaintiff." FAC ¶ 1; *id* ¶ 12 ("[Elkhorn] and [D'Arrigo] are each an 'employer' within the meaning of 29 U.S.C. § 203(d)").

- Plaintiff alleges D'Arrigo was a "'client employer' as defined by Cal. Lab. Code § 2810.3(a)(1)(A), utilized Defendant [Elkhorn] as a labor contractor, and shared liability with Defendant [Elkhorn] for all civil legal responsibility and civil liability for payment of wages due to Plaintiff." FAC ¶ 8; *see also id.* ¶ 11 ("[Elkhorn] and [D'Arrigo] entered into a joint venture to bring H-2A workers into the United States for continuous work in California and Arizona, and as part of that joint venture, [D'Arrigo] knew or had reason to know of [Elkhorn's] practices related to recruitment, housing, meals and other terms and conditions of the H-2A job orders."); *id.* ¶ 17 ("[Elkhorn] in a joint venture with Defendant [D'Arrigo], submitted multiple job orders. . . for clearance and approval in conjunction with their H-2A applications for the 2016, 2016–2017 and 2017 seasons."); *id.* ¶ 25 ("Plaintiff and other workers were recruited by Defendant [Elkhorn] to perform work for [D'Arrigo]"); *id.* ¶ 47 ("Plaintiff worked on a crew led by [Elkhorn's] crew leader . . . and [D'Arrigo's] supervisor").

- Throughout the FAC, Plaintiff alleges that Defendants—in the plural and without distinction—engaged in conduct that violated Plaintiff's rights. *See, e.g.,* FAC ¶ 23 ("Defendants did not compensate Plaintiff and . . . other workers . . . for time spent exercising at the employers' direction."); *id.* ¶¶ 26, 27, 29, 30, 31, 34–40, 49–51, 53–56, 58–59, 61, 73–74, 76–77, 81–85, 88, 90–92, 94–96, 102–103, 130–214.

- Plaintiff testified at his deposition that when he first entered the United States in 2016 on an H-2A visa, he was aware that he was recruited by Elkhorn to do work for D'Arrigo, and this understanding carried into the 2017 season as well. Silva Decl., Ex. 7 ("Pl. Depo. Tr.") at 38:2–41:3. Plaintiff summarized, "We were Elkhorn employees but working for D'Arrigo, only D'Arrigo." *Id.* at 41:10–11.

These supporting allegations and evidence are similar to the facts in *Garcia*, in which the California Court of Appeal determined that the equitable estoppel applied and the nonsignatory defendant could enforce the arbitration agreement. In *Garcia*, the plaintiff was hired by a temporary staffing company, Real Time Staffing Services, and assigned to work for another company, Pexco. 11 Cal. App. 5th at 784. The plaintiff signed an agreement that "any dispute" that he and Real Time could not resolve informally would be determined by binding arbitration. *Id.* Plaintiff then filed suit against Real Time and Pexco for violations of the California Labor Code during his assignment with Pexco. *Id.* at 785. He alleged that all acts were attributable to "Defendants" and each cause of action was lodged against "All Defendants" with no distinction made between Real Time or Pexco. *Id.* In finding that equitable estoppel applied and Pexco could enforce the arbitration agreement as a nonsignatory, the court explained that the "claims presumed the existence of the employment agreement with the signatory defendant." *Id.* at 787. It noted that "all of [the plaintiff's] claims are intimately founded in and intertwined with his employment relationship with Real Time, which is governed by the employment agreement compelling arbitration" and that "all of [the plaintiff's] claims are based on the same facts alleged against Real Time." *Id.* at 788; *see also id.* at 787–88 ("[Plaintiff] does not distinguish between Real Time and Pexco in any way."). The court further explained that the plaintiff "cannot attempt to link Pexco to Real Time to hold it liable for alleged wage and hour claims, while at the same time arguing that the arbitration provision only applies to Real Time and not Pexco." *Id.* "Because the arbitration agreement controls Garcia's employment, he is equitably estopped from refusing to arbitrate his claims with Pexco." *Id.*

The Ninth Circuit recently cited *Garcia* favorably and applied its reasoning to conclude that a plaintiff was equitably estopped from avoiding arbitration in another case involving an

employee hired by a temporary staffing company and assigned to work for another employer.  *See Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d 867, 874–75 (9th Cir. 2021) ("The facts here are like those in *Garcia*.  Franklin signed two arbitration agreements with USSI and was then assigned to work for USSI's client, the Hospital—a nonsignatory to the arbitration agreements.  Franklin alleges that the Hospital failed to give her proper meal breaks, pay her for off-the-clock work, provide accurate wage statements, or reimburse her for expenses she incurred during her orientation.  Like the plaintiff in *Garcia*, Franklin also brings statutory claims against the Hospital under the California Labor Code").  Relying on *Garcia,* the court in *Franklin* explained, "We analyze Franklin's claims by looking at the relationship between the parties and their connection to the alleged violations."  *Id.* at 875.  "In doing so, we find that Franklin's employment with USSI is central to her claims."  *Id.*  "Although Franklin omits any mention of USSI from her complaint, the substance of her claims is rooted in her employment relationship with USSI, which is governed by the Arbitration Agreement."  *Id.*

The Court finds *Garcia* and *Franklin* instructive and applicable here.  Like the plaintiffs in those cases, here, Plaintiff brings his claims against his direct hire employer, Elkhorn—a labor contractor, akin to the temporary staffing agencies in those cases—as well as Elkhorn's client grower, D'Arrigo—akin to the assignment/client companies in those cases.  The complaint and deposition testimony make clear that Plaintiff understood and alleged that all his work as an employee of Elkhorn was done exclusively for D'Arrigo.  The factual allegations consistently indicate that Plaintiff was supervised by representatives of both companies.  Additionally, Plaintiff groups the two defendants together throughout the complaint, alleging the same misconduct and factual bases for liability as to both defendants.

Although Plaintiff is correct to point out that he raises three claims *exclusively* against Defendant Elkhorn and that, thus, the complaint does not generically allege misconduct against both defendants on *all counts* as in *Garcia*, this does not change that fact that all eleven counts that Plaintiff alleges against D'Arrigo are likewise alleged against Elkhorn on the exact same factual bases.  That Plaintiff asserts some claims against only Elkhorn does not alter the fact that *all* of Plaintiff's claims against D'Arrigo are brought jointly against D'Arrigo and Elkhorn.  Plaintiff

does not distinguish between the conduct of each defendant with regards to those counts.  *See* FAC ¶¶ 130–214.[2]  Moreover, in *Franklin*, where the plaintiff chose to omit reference to the second employer, USSI, in the complaint entirely, the court explained that the equitable estoppel analysis is not a formalistic exercise in assessing whether the plaintiff pleaded all claims generically against multiple defendants.  998 F.3d at 875.  Instead, the court must look to the "relationship between the parties their connection to the alleged violations."  *Id.*  Here, where all claims against D'Arrigo are also raised against Elkhorn and are based on the same factual allegations, the complaint clearly evinces the requisite "relationship" and "connection" to warrant application of the equitable estoppel doctrine.

Plaintiff's additional counterarguments are also unpersuasive.  First, Plaintiff cites three cases in which courts declined to apply the equitable estoppel theory to permit a nonsignatory to enforce an arbitration agreement.  Suppl. Opp. at 18–19.  But none of those cases involved employment relationships wherein both defendants are closely related and jointly identified in the core allegations of the complaint as here, in *Garcia*, or in *Franklin*.  *See Jarboe v. Hanlees Auto Group*, 53 Cal. App. 5th 539, 545 (2020) (rejecting equitable estoppel theory asserted by affiliated car dealerships against employee of a different dealership where there was no evidence as to the relationship between the affiliates and their shared employment practices); *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1091 (9th Cir. 2020) (rejecting equitable estoppel theory asserted by Uber against plaintiffs who never downloaded the Uber app and therefore never agreed to Uber's arbitration provision); *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1230 (9th Cir. 2013) (declining to apply equitable estoppel because claims against BestBuy for misrepresenting the nature of a transaction involving DirecTV did not rely on, and were not intertwined with, terms of the

---

[2] The Court notes that with regards to Plaintiff's Thirteenth Cause of Action, for negligence, Plaintiff alleges two separate legal theories for the basis of Plaintiff's claims against the two defendants, but, nonetheless, the underlying factual basis for the claims are the same.  See FAC ¶¶ 211–12 ("Defendant ELKHORN PACKING, as alleged, has failed to exercise due care in the management of the food provision to its workers and acted negligently in each such act or omission. Defendant D'ARRIGO BROS. breached the duty of care it owed to Plaintiff as a worker employed on its premises in failing to take action to mitigate a known health hazard and acted negligently in each such act or omission . . . Defendants acted negligently during the 2016 and 2017 lettuce seasons by providing food that was spoiled and contaminated and continuing to provide this contaminated food after workers complained about its quality.").

1    DirecTV Customer Agreement containing the arbitration clause).  Thus, those cases do not apply

2    nor alter the analysis here.

3         Second, Plaintiff argues that in the absence of a California Supreme Court case directly on

4    point here, the Court should conclude that the California Supreme Court would be unlikely to

5    follow the reasoning or approach taken by the California Court of Appeal in *Garcia*.  Suppl. Opp.

6    at 20–22.  But the Ninth Circuit expressly considered this precise argument and rejected it in

7    *Franklin*.  998 F.3d at 872 ("There are no California decisions inconsistent with *Garcia*, and we

8    see no evidence that the California Supreme Court would reject *Garcia*'s reasoning.").  The Court

9    is bound by the Ninth Circuit's analysis absent a clear indication from the California Supreme

10   Court to the contrary.

11        Finally, third, Plaintiff returns to the position he advanced in contending that the FAA does

12   not apply at all to the arbitration agreements.  *See supra* Discussion § A.  Plaintiff argues that the

13   arbitration agreements are not contained in the Department of Labor work orders or Plaintiff's

14   employment contract and, therefore, are standalone contracts which do not control or pertain to the

15   Plaintiff's employment agreement.  Suppl. Opp. at 16–18.  Therefore, Plaintiff argues that this

16   case is unlike *Garcia* or *Franklin* because the arbitration agreement is untethered from an

17   underlying contract specifying any employment obligations.  *Id.* at 18 ("[T]he only obligation set

18   forth in that agreement is the mutual obligation to arbitrate future disputes.  No other obligations

19   regarding the employment relationship between Plaintiff and Elkhorn are discussed in the

20   arbitration agreement.").  But this argument fails to persuade for the same reasons the Court

21   concluded it was insufficient to render the FAA inapplicable.  *See supra* Discussion § A.  Indeed,

22   as previously discussed, the arbitration agreements expressly refer to disputes related to Plaintiff's

23   *employment* with Elkhorn; hence, the arbitration agreements clearly pertain to Plaintiff's rights

24   and entitlements connected to his employment relationship with Elkhorn.  And here, where the

25   allegations and deposition testimony make clear that Plaintiff's employment with Elkhorn was

26   specifically predicated on work completed exclusively for D'Arrigo, the equitable estoppel theory

27   applies.  Plaintiff's argument again overlooks the "relationship between the parties their

28   connection to the alleged violations."  998 F.3d at 875.

1   Thus, the Court concludes that Plaintiff's claims against D'Arrigo are inherently

2   inseparable from the claims against Elkhorn.  *Kramer*, 705 F.3d at 1128–29; *Garcia*, 11 Cal. App.

3   5th at 786.  Therefore, Plaintiff is equitably estopped from avoiding arbitration as to those claims

4   against D'Arrigo even though D'Arrigo is not a signatory to the arbitration agreements.  D'Arrigo

5   may enforce the arbitration agreements.

6       2.     Agency and Third-Party Beneficiary

7   Defendants additionally argue that D'Arrigo may enforce the arbitration agreements as a

8   nonsignatory as an agent of Elkhorn and as a third-party beneficiary to the arbitration agreements.

9   Suppl. MTC at 14–16.  Because the Court concludes that Plaintiff is equitably estopped from

10   avoiding D'Arrigo's request to arbitration under the agreements, *see supra* Discussion § C(1), it is

11   unnecessary for the Court to address these additional theories.  Therefore, the Court declines to

12   reach those questions.

D.    Arbitrability of Claims

14   The next dispute the parties raise with regards to the scope of coverage of the arbitration

15   agreements is whether certain Plaintiff's claims are arbitrable.  Defendants contend that all

16   fourteen of Plaintiff's causes of action are arbitrable and, thus, must be compelled to arbitration.

17   In opposition, Plaintiff argues that his PAGA claim against both Defendants (count 12, FAC

18   ¶¶ 194–205) and tortious intrusion upon seclusion claim against Elkhorn (count 14, FAC ¶¶ 215–

19   22) may not be compelled to arbitration.

20       1.     PAGA Claim

21   Plaintiff argues that the language of the arbitration agreements constitutes an invalid

22   wholesale waiver of Plaintiff's right to pursue a PAGA claim in any forum, whether in court or in

23   arbitration.  Suppl. Opp. at 25–26; *see Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906,

24   1924 (2022) ("The agreement . . . purported to waive 'representative' PAGA claims.  Under

25   *Iskanian*, this provision was invalid if construed as a wholesale waiver of PAGA claims.").  Here

26   the relevant waiver provision reads:

27           To the extent permitted by law, the Company and I agree to waive
           any right to file any class or representative claims addressing wages

28           or other terms or conditions of employment in any forum.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Agreement ¶ III.  Plaintiff contends that this provision is an invalid wholesale waiver of PAGA

2  claims, and it evidences the Elkhorn's intent "that it did not agree to have PAGA claims filed in an

3  arbitral forum."  Suppl. Opp. at 26.  So, Plaintiff argues, the Court may not enforce the PAGA

4  waiver, and, in deciding where the PAGA claim should ultimately be heard, the Court must honor

5  Elkhorn's intent reflected in the contract not to have the PAGA claim arbitrated.  *Id.* (citing *Viking*

6  *River*, 142 S. Ct. at 1923 ("The most basic corollary of the principle that arbitration is a matter of

7  consent is that 'a party can be forced to arbitrate only those issues it specifically has agreed to

8  submit to arbitration[.]")).  The Court disagrees.

9  Plaintiff fails to grapple fully with the Supreme Court's recent decision in *Viking River*.  In

10 *Viking River*, the Supreme Court explained that claims under PAGA can be said to be

11 "representative" claims in two different ways:  first, a PAGA claim is always representative, even

12 when pertaining only to allegations of misconduct suffered by an individual, because a PAGA

13 plaintiff always represents the State of California.  *Id.* at 1916.  Second, some PAGA actions may

14 be "representative" in the sense that they can address violations suffered by a number of

15 employees beyond just the plaintiff.  *Id.*  In recognizing this distinction in the "representative"

16 nature of PAGA, the Supreme Court held that, notwithstanding the plaintiff's inherent role as a

17 representative of the state, PAGA claims can be split into "individual" claims and non-individual

18 "representative" claims, thereby reversing the rule from the California Supreme Court in *Iskanian*

19 *v. CLS Transportation* holding that PAGA claims are indivisible and may not proceed as separate

20 individual and representative actions.  *Id.* at 1924 ("We hold that the FAA preempts the rule

21 of *Iskanian* insofar as it precludes division of PAGA actions into individual and non-individual

22 claims through an agreement to arbitrate.").  The Supreme Court held that an arbitration agreement

23 which compels individual claims to arbitration is enforceable as to the individual portion of a

24 PAGA claim.  *Id.* at 1924–25 ("The agreement between Viking and Moriana purported to waive

25 'representative' PAGA claims . . . But the severability clause in the agreement provides that if the

26 waiver provision is invalid in some respect, any 'portion' of the waiver that remains valid must

27 still be 'enforced in arbitration.'  Based on this clause, Viking was entitled to enforce the

28 agreement insofar as it mandated arbitration of Moriana's individual PAGA claim.").

United States District Court
Northern District of California

Likewise, here.  The arbitration agreement here is not a wholesale waiver—waiving both individual and representative claims—because it waives only "representative claims."  Agreement ¶ III.  This waiver refers to "representative claim" in the context of class actions, indicating that it refers to the second meaning of "representative" under the *Viking River* analysis.  There is no indication that the waiver here refers to the first meaning of "representative" or bars individual claims.  Indeed, the waiver provision here is unlike the provision considered to be a wholesale waiver in *Viking River* which expressly waived a plaintiff's right to bring a PAGA action altogether.  142 S. Ct. at 1916.  The waiver provision here is *not* a wholesale waiver of Plaintiff's individual and representative PAGA rights; it only waives Plaintiff's right to file a non-individual PAGA claim on behalf of other workers.  Accordingly, the waiver provision here is not unlawful.  Moreover, because the *representative* action waiver here does not apply to Plaintiff's *individual* PAGA claim, the Court cannot credit Plaintiff's argument that Elkhorn intended that no portion of Plaintiff's PAGA claim be submitted to arbitration.  To the contrary, Plaintiff's *individual* PAGA claim *must* be compelled to arbitration under the plain language of the scope provision of the agreement:  "The Company and I agree that all claims, disputes and controversies arising out of, relating to or in any way associated with my employment by the Company . . . shall be submitted to final and binding arbitration."  Agreement ¶ I; *Viking River*, 142 S. Ct. at 1925 ("Viking was entitled to enforce the agreement insofar as it mandated arbitration of Moriana's individual PAGA claim.  The lower courts refused to do so based on the rule that PAGA actions cannot be divided into individual and non-individual claims.  Under our holding, that rule is preempted, so Viking is entitled to compel arbitration of Moriana's individual claim.").

Having concluded that the representative action waiver here does not apply to the individual portion of Plaintiff's PAGA claim and that the individual portion of the PAGA claim must be compelled to arbitration, the Court is left with the question of what to do with non-individual portion of Plaintiff's PAGA claim.  *See* FAC ¶ 195 ("Plaintiff brings this claim on behalf of himself and all aggrieved employees").  Under *Viking River*, the waiver applies.  However, *Viking River* acknowledges that representative claims under PAGA are preserved against waivers under *Iskanian*.  *Viking River*, 142 S. Ct. at 1925 ("Under our holding in this case,

those claims may not be dismissed simply because they are 'representative.' *Iskanian*'s rule remains valid to that extent.").  On the other hand, the survival of a substantive representative PAGA claim raises the question of whether the Plaintiff herein has standing to enforce that claim in this court given his individual PAGA claim is now remitted to arbitration.  *Id.*

The court in *Viking River* assumes he does not.  *Id.*  However, as Justice Sotomayor notes in her concurrence, the issue of statutory standing under PAGA is subject to clarification under state law.  *Id.* ("Thus, the Court reasons, based on available guidance from California courts, that [Plaintiff] lacks 'statutory standing' under PAGA to litigate her 'nonindividual' claims separately in state court.  Of course, if this Court's understanding of state law is wrong, California courts, in an appropriate case, will have the last word.").  Indeed, the California Supreme Court has taken up the issue of statutory standing in the pending case *Adolph v. Uber Technologies, Inc.*, No. G059860, 2022 WL 1073583 (Cal. Ct. App., Apr. 11, 2022), *review granted* (Cal. July 20, 2022).  Accordingly, the Court will stay the representative PAGA claims pending further legal developments.  *See George v. Manheim Invs., Inc.*, 731 F. App'x 624, 627 (9th Cir. 2018) (permitting the California district court to stay the case pending the resolution of a California Supreme Court decision that may inform the district court's reasoning on a threshold issue).

The Court thus compels to the individual portion of Plaintiff's PAGA claim to arbitration and stays the representative PAGA claims until further order.

### 2.   Tortious Intrusion Upon Seclusion

Finally, Plaintiff argues that the arbitration agreements do not cover Plaintiff's fourteenth cause of action for tortious intrusion upon seclusion.  FAC ¶¶ 215–22; Suppl. Opp. at 30.  This claim alleges that the intrusions of Elkhorn's agents into Plaintiff's private space "went beyond the employer's need to inspect the premises and amounted to an intentional intrusion intended to send the message to Plaintiff that he retained no right to privacy."  FAC ¶ 220.  Thus, Plaintiff contends count 14 is not a claim or dispute "arising out of, relating to or in any way associated with my employment" within the meaning of Paragraph I of the agreements.

The Court is not persuaded by Plaintiff's coverage argument.  The arbitration agreement require arbitration of "all claims, disputes and controversies arising out of, relating to or in any

way associated with [Plaintiff's] employment."  Agreement ¶ I.  Given this broad scope, the Court cannot conclude that the tortious intrusion upon seclusion claim is in no way related to Plaintiff's employment.  Indeed, here Plaintiff alleges the tort was committed by Elkhorn's employees, at the site of Plaintiff's employer-provided housing.  FAC ¶¶ 41–42.  Plaintiff alleges that the intrusions exceeded "the employer's need to inspect the premises," but clearly this allegation tees up a dispute as to whether Elkhorn was or was not acting within the scope of Plaintiff's employment.  Therefore, the claim is within the scope of the arbitration agreement and is arbitrable.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' post-remand supplemental motion to compel arbitration and stay proceedings is **GRANTED**.  This case is hereby **STAYED** until the completion of arbitration proceedings.  The parties are directed to inform the Court within thirty (30) days of completion of the arbitration proceedings and to file a joint statement at that time regarding the parties' proposal for how to proceed.

This order disposes Docket No. 121.


**IT IS SO ORDERED**.


Dated: October 18, 2022

_____
EDWARD M. CHEN
United States District Judge